### THE JOHN J. FEENEY.
### THE LOUISE SCHUMANN.
### THE THOMAS R. COYNE.
### THE CORNELL NO. 20.

#### FEENEY et al. v. COYNE et al.

#### No. 12966.

District Court, E. D. New York.
March 10, 1933.

Thomas A. McDonald, of New York City, for libelants.

William J. Mahar, of New York City, for claimant Theresa M. Coyne.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine and Henry P. Elliott, both of New York City, of counsel), for claimant the Cornell No. 20.

GALSTON, District Judge.

The libel alleges that barges John J. Feeney and Louise Schumann, while proceeding in the New York State Barge Canal between locks 33 and 32, in tow of the tug Cornell No. 20 bound from Buffalo to New York, sustained damage.

It is alleged that the tug Thomas R. Coyne was seen proceeding west with four barges in tow; that the Cornell No. 20 thereupon went over to the starboard side of the canal and slackened her speed until the tug and her tow were resting on the starboard side of the canal. The tug Coyne with her tow, it is stated, continued coming on toward the Cornell No. 20 and her tow, and instead of keeping to the port side of the canal, kept well over to the side of the canal where the Cornell No. 20 and her tow were lying. It is alleged that the tug Coyne safely passed the Feeney and the Schumann, but the Coyne's hawser tier boat came into violent collision with the port side of the Feeney, as a result of which the Feeney collided with the Schumann.

The fact of damage is not disputed. The Coyne, however, lays the entire fault on the Cornell.

The conflicting stories are impossible to reconcile. Each tug contends that she and her tow were navigating, each on her star-

board side of the canal. Of course, if this were so, no collision would have resulted.

The Cornell had four barges in tow; the Emma McNichol and the Alice Brody, in addition to the John J. Feeney and the Louise Schumann. All the barges were loaded. The Cornell No. 20 had two hawsers out, approximately 110 feet in length, between the tip of the stern of the Cornell No. 20 and the bow of the John J. Feeney. The Feeney and the Schumann were about 29 feet wide, and the McNichol and Brody about 22 feet wide. The tow of the Cornell was steered from the bow of the Schumann.

The Coyne had four box scows, approximately 30 feet in width, also arranged tandem fashion, and all loaded. The hawser from the Coyne to the George Stevenson, her head barge, was about 60 feet, and the steering of this tow was from the port bow of the James B. Malone, the second boat in the Coyne tow.

The distance between lock 32 and lock 33 is about one mile. Proceeding west, which was the Coyne's direction, there is a slight turn in the canal to the south, after which the stretch is straight ahead.

The witnesses generally agreed that the canal in the level is about 75 feet wide on bottom and about 100 feet wide on top. The banks on each side are approximately 12 feet high, and sloping. In the channel the water is 12 feet deep.

In the matter of signals, I think it may be said that the tugs exchanged one blast whistles. The Coyne on passing the Feeney blew three short signals. From the time of the exchange of the one whistle blasts McNichol, who was at the wheel of the Louise Schumann, was the only eyewitness of the movements of both of the tugs and tows. His duty was to keep in the wake of the tug. At the moment of the exchange of signals he said that he was on the right-hand side of the canal, though he admitted that when he left lock 33 they did not go over to the right hand side until they met the Coyne; that at that time he wheeled to the starboard side. At that time the tugs were a couple of hundred feet apart.

"Q. So when the tugs were 100 or 200 feet apart you went over against the starboard bank, is that right? A. Yes, sir.

"Q. And I suppose your tow responded right away? A. Yes, sir.

"Q. So that from that time on— A. The tug hauled us—

"Q. So that from that time on you scrap-ed up against the starboard bank, as you think, is that correct? A. Yes, correct.

"Q. And one reason you know you were up against the starboard bank is because the tug was pulling you in there? A. Yes, sir.

"Q. But it had no effect on your wheel one way or the other? A. The wheel was almost dead then, it wasn't much use; I was holding it over to the bank all the time.

"Q. At the time the Coyne passed the head boat in your tow did it appear to you then there was going to be a collision? A. Yes, sir.

"Q. And you were up against the starboard bank then? A. Yes, sir.

"Q. Was the Cornell pulling you ahead? A. Yes, sir.

"Q. Was the Coyne under way? A. Yes, sir."

The captain of the tug Coyne testified in agreement with McNichol that when he saw the Cornell it was about a quarter of a mile away. At that time the Coyne was in the center of the canal going full speed. As the tugs exchanged one blast signals, he said the Coyne pulled over to his starboard side, slowed to half speed, and continued edging over. He said that the Cornell apparently went over to her own starboard side of the channel, but that the tow did not seem to be in proper order, that is, it was not following the tug and was on the wrong side of the channel. When the collision seemed inevitable to him, because of the kinking to port of the Cornell tow, he blew a danger signal and endeavored to swing his boat so as to get to the starboard side. Coyne, on the whole, told a consistent story and was an intelligent witness.

The captain of the Cornell was a very much younger man, at the time of the collision not more than nineteen years of age. His story is that when the tugs exchanged one blast signals at a distance of one-quarter of a mile apart, he slowed down under one bell and pulled to the starboard side. He contends that the Coyne came on in the middle of the canal and did not pull over to the starboard at all. At the time of the collision he starboarded his wheel in order to throw the head boat's bow in toward the bank. That maneuver threw the strain on the port hawser that was intended to hold the head boat, as it brought the stern of the tug to starboard. Then the propeller had hit the bank. After the collision he could not immediately move from that position because he was aground on the starboard side of the canal.

Accepting the story of the captain of the Cornell, it would seem to follow that if the tug went aground she would have had no control of her tow. McNichol had testified that his wheel was also dead; and it would, therefore, follow that not only the tug had lost control of her tow, but also that there was no steering done from that moment on by the tow. At the time that O'Brien had but his helm to starboard just before the collision, the Cornell was abreast of the Stevenson, the Coyne's head barge. At this moment, of course, the Coyne having a shorter hawser had not reached the Cornell tow. With the Cornell still pulling to her starboard, her tow could not have been along the starboard bank, but was still out in the canal. O'Brien's story would seem to throw doubt on the contention that the Cornell tow was on its starboard side of the canal, and on the contrary would seem to confirm the testimony of Captain Coyne and of Russell, on the third Coyne boat, that the tow was out of line.

█ In the circumstances I find the Coyne free from fault and believe that the damage arose because of the negligence in operation of the Cornell No. 20.

█ The impleaded claimant, however, contends that the libelants, by contract, have waived any rights of recovery against the Cornell Steamboat Company and its tug. The contract was entered into between the libelant Feeney, as owner of the John J. Feeney and as agent of the Louise Schumann, with the Buffalo Barge Towing Corporation, and related to the canal season of 1931. It contains, among other matter the following significant clauses:

"Third: The party of the first party is to arrange for the benefit of the parties hereto, all towing services required for moving the boats for the loading and delivery of cargoes laden hereunder. * * * Such service may be provided under such arrangements as the party of the first part in its sole discretion may make with towing vessels or their owners, charterers or operators."

"Twelfth: It is agreed that all risks of damage, loss or expense to the barges named herein, howsoever caused, occurring during the currency of this agreement shall be assumed by the party of the second part. In the event that the party of the first part has arranged or hereafter shall arrange with Cornell Steamboat Company and/or the owner of any towing vessel that, in consideration of services rendered by the said towing vessel, the party of the first part holds the said towing vessel and her owner harmless from, and waives and releases all claims against them for, damages to the barges towed by the said towing vessel, howsoever caused, either by the negligence of the said towing vessel or otherwise, then the party of the second part will and hereby does take over and assume all of the said obligations of the party of the first part under its arrangement with Cornell Steamboat Company and/or the owner of any towing vessel; and, in said event, the party of the second part agrees that it will and hereby does hold harmless and release the said towing vessels and/or their owners and/or Cornell Steamboat Company and/or the Buffalo Barge Towing Corporation from all liability for any and all claims for damages to the barges named herein, whether the said damages be due to the negligence of the said towing vessel or be due to any other cause whatsoever. The provisions contained in this clause shall be binding, whether or not the party of the second part obtains any insurance under clause 'Eleventh' of this agreement. * * * "

The Cornell Company had entered into an agreement with the Buffalo Barge Towing Corporation to furnish tugs, on the understanding that it should be protected against any claim for damage whatsoever.

A similar question arose in the matter of John Swenson v. Steamtug Primrose et al., 3 F. Supp. 267, tried before me this term; and on the authority of The Oceanica (C. C. A.) 170 F. 893, and Sun Oil Co. v. Dalzell Towing Co., Inc. (C. C. A.) 55 F.(2d) 63, therein relied upon, I reached the conclusion that the effect of the contract was a waiver by the owner of the scows for damages arising from the negligence of the towage company and her tugs.

Accordingly the libel will be dismissed.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.