## THE MELVIN AND MARY.

## THE ARTHUR DES ROSIERS.

## THE PLATTSBURG–SOCONY.

## THE OLIVE K.

### Nos. 15237, 15239.

District Court, E. D. New York.

May 19, 1938.

Purdy, Mason & Lamb, of New York City (Frank C. Mason, of New York City, of counsel), for libelants.

Louis Mead Treadwell, of New York City (Barry, Wainwright, Thacher & Symmers and John C. Prizer and Joseph M. Brush, all of New York City, of counsel), for the Plattsburg-Socony.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for Huffman Const. Co.

Platow, Lyon & Stebbins, of New York City (Edward F. Platow, of New York City, of counsel), for the Olive K.

ABRUZZO, District Judge.

The libellants, Mary F. Chapman and Arthur Des Rosiers, have filed libels to recover damages sustained by their barges in a collision which occurred at Three River Point on April 27, 1937.

Each of the libellants owned a barge which was being towed by the steam tug "Olive K.". The tug and tow were eastbound in the New York State Barge Canal. The place of the accident was in the vicinity of Three River Point, the exact point being "219" opposite the wide entrance to the Oswego River (Des Rosiers Exhibit 1, which is a yellow navigation chart). From the east, the Oneida River flows into the Oswego, and from the west, the Seneca River flows into it. Several hundred feet east of the point "219" is a vehicular bridge, and to the east of that is a New York Central Railroad bridge. The distance from point "219" to the easterly side of the

railroad bridge is somewhere between 600 and 700 feet.

At a point opposite the Oswego River and along the southerly side of the canal, there is a concrete wall. A dredge, belonging to the respondent The Huffman Construction Company, was along side of this wall at the point marked "219". To the westward of this dredge lay a steel scow. Outside of the dredge was a wooden dump scow which overlapped a part of the steel scow. There were also two small power boats, the "Carlotta" and the "Little Heron", the location of which with respect to the dredge is in dispute, but this disputed fact is not of vital importance.

The dump scow was the outermost of the dredging equipment. There is testimony that the extreme outermost of this dredging equipment was from 85 feet to 100 feet from the wall.

The tug "Olive K." was towing three barges and brought the first barge into collision with the westerly end of the dump scow at a place inside of its outermost point. As a result of the collision, the third barge was, in some unknown manner, damaged. The second one sustained no damage.

The R. C. Huffman Construction Company, owner of the dredging equipment, were sued in personam and the motor tanker "Plattsburg-Socony" was sued in rem. The respondents The Huffman Construction Company and the motor tanker "Plattsburg-Socony" impleaded the steam tug "Olive K.".

The claim of the libellants is that the tug "Olive K." was forced to collide with the dredging equipment because of the position of the respondent motor tanker "Plattsburg-Socony". It is their theory that the "Olive K." could not have maneuvered its tow to pass the "Plattsburg-Socony" safely because of the existing conditions. It is the contention of the navigator of the "Olive K." that he was trapped and had one of two recourses to follow, either to come into collision with the dredging equipment or to navigate on the outside of the dredging equipment and collide with the "Plattsburg-Socony". The libellants seek to fasten liability on the respondent The Huffman Construction Company, contending that the dredging equipment was too far out from the wall.

Whether or not the motor tanker "Plattsburg-Socony" is responsible for the damage to these barges depends upon the answer to three problems which confront the libellants. These are:

1. Could the "Olive K." have turned to port and gone up the Oswego River?

2. Could the "Olive K." have stopped her tow in time to avoid contact with the dredging equipment?

3. Could the "Olive K." have proceeded around the dredging equipment and have passed port to port without colliding with it?

Undoubtedly the captain of the "Olive K." could have gone up the Oswego River assuming and adopting the most favorable inferences to be drawn from the testimony of the captain of the "Olive K.". He saw the "Plattsburg-Socony" when he was 200 feet from the dredging equipment. At that time the "Plattsburg-Socony" was lying under the two bridges and looked as though she were drifting.

The captain of the "Olive K." testified that it was impossible to go up the Oswego River because the current was running that way. It was his opinion that he would pile up on the rocks if he made that attempt. However, there was a large expanse of water at that point as indicated on Des Rosiers Exhibit 1 and if the current were running that way it would appear that it would be feasible and safe to turn and go with the current. Had he done so that particular time there would have been no necessity for colliding with the dredging equipment.

Upon approaching the dredging equipment, the testimony indicates that the captain of the "Olive K." believed that he could not safely pass on the outside of the dredging equipment without colliding with the "Plattsburg-Socony". This motor tanker was under the bridges. Whether the tanker was moving or not is a disputed matter. It is, however, the contention of the respondent "Plattsburg-Socony" that she was endeavoring to ascertain whether or not the tanker could be safely navigated under the bridges and for that reason she was standing still. This fact was borne out by the testimony of the captain of the "Olive K." who stated that he saw the motor tanker at the bridges and at that time she appeared to be drifting, although he was not certain of that. Sufficient space existed at that point for the captain of the "Olive K." to maneuver his tug beyond the dredging equipment and pass the "Plattsburg-Socony". A space of somewhere between 600 and 700 feet existed from the place of the

collision to the easterly side of the railroad bridge.

The captain of the "Olive K." shut off the power of his tug just prior to the collision and was drifting. There was a 75 feet hawser from the tug to the first barge and while drifting the captain undoubtedly lost, at least, partial control of his tow. This is borne out by the fact that the tug "Olive K." was outside of the outermost scow at the moment of the collision. At that time, the first barge came into contact with the inside end of the same scow (Des Rosiers Exhibit 7). It was probably the intention of the captain of the "Olive K." to drift slowly outside of the dredging equipment. He testified that he believed that there was an eddy at that point. If that were true, this eddy caused the first barge to drift into the scow. The captain of the "Olive K." was solely to blame for that.

The libellants made a further claim that the dredging equipment was moored too far out in the canal. This equipment was moored at the point of collision pursuant to the performance of a contract with the Canal Department of the State of New York. It was within its legal rights to be at that particular location because of the work it had contracted to do.

Furthermore, it appears that the dredging equipment was under observation by the captain of the "Olive K.". He saw it for 400 feet prior to reaching the same. At that particular moment, his tow was 100 feet out from the wall and had he continued in a straight line he would have safely passed this dredging equipment (see p. 57 of the Rec.).

It follows, therefore, that a decree should enter in favor of the "Plattsburg-Socony" and the R. C. Huffman Construction Company.

The impleaded tug "Olive K." cannot be held responsible. Exhibits 1 and 2 (releases) offered in evidence indicate that an agreement was made between the owner of the tug and the owners of the respective barges to the effect that the tug would not be held liable for any negligence on the part of the "Olive K.". Such an agreement has been upheld and found to be binding upon the parties making the same. The Primrose, D.C., 3 F.Supp. 267; The John J. Feeney, D.C., 3 F.Supp. 270. The rule is laid down in these two cases that a contract releasing liability was a waiver by the owners of the scows for damages arising from the negligence of the towage company and her tugs.

The proctors for the libellants at the opening of the trial stipulated that the "Olive K." could not be held because of the existence of the agreement in question. It is unfortunate for the libellants that such an agreement was entered into.

A decree may be entered in conformity with this opinion on two days' notice.