**CITY OF LONG BEACH, a municipal corporation, H. Halvorsen, J. A. Jacobsen and Jacobsen & Company, Inc., a corporation, Appellants,**

v.

**AMERICAN PRESIDENT LINES, LTD., a corporation, Appellee.**

No. 13972.

United States Court of Appeals, Ninth Circuit.

June 14, 1955.

18. See 32 C.F.R. § 1625.2.

854

Ekdale, Shallenberger & Toner, San Pedro, Cal., and Irving M. Smith, Long Beach, Cal., Arch E. Ekdale, Gordon P. Shallenberger, George E. Toner, San Pedro, Cal., for appellant.

Lillick, Geary & McHose, William A. C. Roethke, Gordon K. Wright, Lawrence D. Bradley, Jr., Los Angeles, Cal., for appellee.

Before POPE, FEE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

This is an admiralty appeal.

On April 19, 1950, the President Van Buren,[1] a C–3 cargo steam vessel, collided with a finger pier at Forster's shipyard in Los Angeles Harbor, doing consequent damage to the piers of Forster and a small fishing boat and a barge of a fishing company.

Pertinent facts follow. On the date mentioned the President Van Buren was being shifted from Berth 145, Wilmington, Los Angeles Harbor, to the Procter & Gamble dock in Long Beach Harbor. The course of the shift begins in a channel of the west basin of Los Angeles Harbor, proceeds thence southerly to a turning basin, thence through the turning basin into the east basin channel and thence through east basin channel and on beyond to Long Beach. The three sectors of the waters in the course of the ship (the west basin channel, the turn-

1. For a related problem made especially interesting by the coincidence of names, refer to the troubles in London of The President Van Buren, an earlier ship bearing the same name, 16 N.S. Aspinwall's Maritime Law Cases, 444.

ing basin and the east basin channel) with which we are concerned together may be roughly described as "U" shaped. The turning basin would be in the bottom of the "U." The area between the inner sides of the "U" is occupied by a tip of Mormon Island.

The ship's master on the day in question was Ralph George Wilson, employed by American President Lines, owner of the Van Buren. Also aboard was one Hans Halvorsen, a harbor pilot employed by Jacobsen & Company, Inc., which concern had a pilotage contract with the City of Long Beach. Other than the harbor pilot who took command of the ship for the passage, all personnel concerned with the movement were regular members of the ship's crew. The movement of the Van Buren was assisted by the tug Pacific Atom, which had its lines tied to the starboard bow of the larger vessel. As the movement proceeded the tug was on the inside of the course formed by the "U" and the Van Buren was on the outside. Coming out of the west basin just before entering the turning basin, the Van Buren had some difficulty in negotiating a narrow neck in the channel running under what is known as the Pacific Electric drawbridge. But it did get through without any mishap. Then the trouble began, and in a few minutes the Van Buren had struck the Forster pier. Only the most superficial damage was done to the Van Buren. The collision was a light one, but the damage of Forster and the fishing company seems to have added up to about $10,000.

The American President Lines, deeming itself liable in rem, paid without suit the damage claims from the collision. In turn, this company herein sought recovery in personam against the City of Long Beach, the Jacobsen Company and Halvorsen for what it has paid. It would hold Long Beach (assuming negligence of Halvorsen) because (it says) Halvorsen was what is known as a compulsory pilot.

The trial court found in favor of American President on all issues and the libelees appeal.

■ The first big issue is negligence. The ghost of trial de novo in this intermediate appellate court has been laid to rest with finality in McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6. But the appellants say that the findings below were clearly erroneous and they argue that we are in a specially advantageous position to reconsider the evidence because so much of it was by deposition. Three witnesses appeared before the trial court: Captain Wilson of the Van Buren, Captain Halvorsen (harbor pilot) and an expert witness produced by the libelees, an engineer named Sims.

On the day of the collision the elements were at peace—no unusual wind, no rain and apparently calm water.

We have examined and reexamined the evidence on negligence. Captain Wilson thinks that the accident was caused essentially by Halvorsen, the harbor pilot, mismaneuvering the ship. Put in the vernacular, Halvorsen got the ship into a place and position where he shouldn't have put it, with the wrong speed and direction, and thus the accident happened. But as Halvorsen tells it, the course he followed was good seamanship. The trouble, says he, came from the fact that he couldn't get a "full astern" command to the engine room promptly and adequately executed. That may have been due to human failure below or more likely to an excess of water in the one boiler which was operating for this shift.[2] Undoubtedly too much water in a steam boiler can result in power problems with the engines.

We do not detail all of the evidence. The admission of default in the performance of one's occupation is a rare incident. Everyone almost always rationalizes the blame over to the other fellow. We think there was abundant evidence here for the trial court to find Captain Halvorsen blameless and the fault wholly

2. At sea this ship uses two boilers. In a harbor it may use one or two.

with Captain Wilson of the Van Buren or his crew. But in sharp contrast was the evidence of Wilson that Captain Halvorsen mishandled the ship as it entered and while it was in the turning basin. Sifting the evidence, we arrive at a place short of an abiding conviction that the trial judge was clearly erroneous in his conclusions on negligence. We do think if we had had the opportunity to see and hear Captain Wilson and Captain Halvorsen we would have had little trouble arriving at a conclusion as to which had overrationalized the experiences of the day. The trial court could take its choice.

Appellant relies heavily herein on the case of City of Los Angeles v. Standard Transp. Co., 9 Cir., 32 F.2d 988. Cursory reading of the case gives some support to the appellant. Closer reading does not. There a harbor pilot was on board. Apparently the employment of the Los Angeles harbor pilot in 1927 was not a compulsory matter. Further, the accident occurred as a result of faulty signals given by the ship to another ship. It is not suggested that the harbor pilot called for improper signals. The crew blew the improper signals. It is not suggested that the harbor pilot blew them. To charge to the master the signals as given instead of to the pilot does not seem amiss. Were it shown that the pilot called for improper signals, the case would be different. Also, doubtless the case is affected by the fact that the employment of the harbor pilot was voluntary on the part of the ship.

Here it was stipulated that Halvorsen started out in charge of the navigation of the Van Buren and was in charge of giving such directions and orders to the tug Pacific Atom as from time to time might be necessary. The lengthy pleadings are to the same effect. The answer of the libelees so far as negligence is concerned dwells upon faulty condition of

the ship when the shift was commenced and upon the faulty execution of "Halvorsen's orders." Under the pleadings we do not think it was open to the libelees to contend, as they appear to do on this appeal, that Halvorsen was under Wilson in command or that Wilson partially resumed command.

We come next to a question wholly of law. Can the City of Long Beach be held liable because Halvorsen was a Long Beach harbor pilot? The Long Beach Harbor to which the Van Buren was bound is municipally controlled and maintained. It adjoins the Los Angeles Harbor at Wilmington, out of which the vessel was bound. The shift began in the Los Angeles Harbor and the ship was still in Los Angeles Harbor as it emerged from the turning basin into the east channel and struck the Forster pier.

Long Beach by ordinance requires that a ship be piloted by a harbor pilot of its designation while within the harbor, while entering or leaving, or while shifting.[3] Apparently Los Angeles has a similar requirement. In practice, as permitted by the reciprocating ordinances, in shifting from one to the other of these adjoining harbors a Long Beach pilot directs the operation from Los Angeles to Long Beach, and if the shift is vice versa a Los Angeles pilot is in charge from Long Beach to Los Angeles.

We are satisfied that the City of Long Beach is acting in a proprietary capacity in maintaining and operating its harbor. It maintains the harbor because it thinks it is good business for it, representing its citizens, to do so. General Petroleum Corporation of California v. City of Los Angeles, 22 Cal.App.2d 332, 70 P.2d 998, 999, 72 P.2d 551.

Long Beach seeks to avoid liability here by reason of the fact that its contract with Jacobsen for pilotage provided that the Jacobsen Company was an inde-

3. The Long Beach tariff provides that a Los Angeles harbor pilot may shift a vessel from Long Beach to Los Angeles Harbor and that such a movement so piloted is exempt from Long Beach pilotage service and charges.

pendent contractor.[4] The contract also provided that the city would have no control over the contractor (except as provided in the contract).[5]

There was no written contract here between the Van Buren and Long Beach, but Long Beach cannot deny that Halvorsen boarded and navigated the vessel pursuant to Long Beach's tariff requirement of compulsory pilotage and cannot deny that he was there as a member of Long Beach's staff of pilots referred to in its tariff. Under those circumstances, we believe the following to be true.

1. The Van Buren had a contract of pilotage with Long Beach.

2. An implied covenant was that this contract for highly personal service would be performed with the necessary skill without neglect. Benenato v. McDougall, 166 Cal. 405, 137 P. 8, 49 L.R.A.,N.S., 1202; Roscoe Moss Co. v. Jenkins, 55 Cal.App.2d 369, 130 P.2d 477; 12 Cal.Jur.2d 346.

3. In the event of negligent performance of Long Beach by its subcontractor or the subcontractor's agents doing the job contracted to be done resulting in loss to the Van Buren, its owner, American President, could sustain an action in contract or tort against Long Beach.

4. While there would be no contract liability of Halvorsen and his employer, an independent subcontractor, to the vessel, a duty of care to the Van Buren's owner existed and the subcontractor could be held in tort for negligence of the pilot.

We believe that the foregoing principles are universally applicable on land. We see no reason to apply any other rules in admiralty.[6]

Of course, generally in law there are many instances where a contractor is not responsible to the owner for his subcontractor's negligent conduct, but such cases do not concern a failure directly involved in the very thing the contractor agreed to do. Those are the cases in which no duty owing by the contractor was violated when the subcontractor was negligent and, overall, most of the cases of non-liability of a general contractor for the negligent acts of a subcontractor are those where the contractor owed no duty of any kind to the person injured.

But Long Beach asserts that even if it were liable for Halvorsen's negligence within its harbor, it couldn't possibly be held that Halvorsen was a compulsory pilot over in Los Angeles Harbor, therefore Long Beach should be excused.

It may be true that Long Beach could not compel the Van Buren to have a Long Beach pilot in Los Angeles Harbor. But it exercised by ordinance its power to have the boat under the pilotage of a Long Beach pilot when the vessel should enter Long Beach Harbor. Halvorsen was on the boat because Wilson had to take him aboard. But should we hold Long Beach liable only the moment the Long Beach pilot crosses the Long Beach line and not liable before the line is reached? We think we should not haggle over the intervening distance between the point where the compulsory pilot takes over to perform his duty of bringing the ship into Long Beach Harbor so long as the performance begins within a reasonable distance of the Long Beach border. Our decision does not depend on the fact, but it is a fact, that Long Beach took the Van Buren's money for pilotage for the whole shift, not for the pilot's

4. The contract provided that Jacobsen, Halvorsen's employer, would be compensated for furnishing pilots by payment to Jacobsen by Long Beach of 60% of its pilotage collections, Long Beach retaining the other 40%.

5. Any exception would be inapplicable on its face to the issues of this case.

6. In addition to the contract duty of Long Beach to maneuver the Van Buren with reasonable skill, we may have in the instant litigation a case where the duty of care, independent of any contract undertaking, is non-delegable. Cf. Robbins v. Hercules Gasoline Co., 80 Cal.App. 271, 251 P. 697.

858

work from the line of Long Beach Harbor to the Procter & Gamble dock in the harbor. As said hereinabove, an obligation is implied that the service Long Beach sells the Van Buren will be performed in a skillful manner. Much different would it be if Long Beach provided by ordinance only that a pilot licensed by Long Beach would be permitted to perform pilotage. But Long Beach said, "Stay out unless you let us furnish you our pilot at a price we fix, which you shall pay us, and which you shall not pay the pilot."

As we close the foregoing opinion, the three Supreme Court cases of Bisso v. Inland Waterways, 75 S.Ct. 629; Boston Metals Co. v. The S. S. Winding Gulf, 75 S.Ct. 649, and United States v. Nielson, 75 S.Ct. 654, have come down. This President Van Buren case is much different. In the Supreme Court cases a contract between the vessel and those maneuvering the ship expressly exempted the latter from liability. The first two cases, where there was dead towage without a pilot on the towed vessel, hold the exculpatory provisions of the contracts invalid. The third involves towage and pilotage by the tow company. In that case, the validity of the non-liability clause was not reached, the issues being disposed of on a basis of construction of the words of the contract.

There is a possible indication in these cases that a contract exempting from negligence the contractor who furnishes pilots may be upheld. But in Van Buren, as between vessel and Long Beach there was no such provision. Only Long Beach and Jacobsen, the contractor who fur-

nishes pilotage for Long Beach, agreed that Jacobsen was to be an independent contractor; thus the argument of exculpation arises. That, for the reasons we have set forth, did not excuse Long Beach.

To the limited extent these three new cases may be applicable, they do not derogate from what we have said and may support us.

Affirmed.[7]

7. The record is unclear as to the difference between Jacobsen individually and Jacobsen & Company, Inc. The libel (claim) says, inter alia, that Halvorsen was an employee of Jacobsen and Jacobsen's company. The answer admitted that Halvorsen was an employee of Jacobsen individually, but did not deny he was an employee of the Jacobsen Company. The pre-trial stipulation says Halvorsen was an employee of Jacobsen individually, but did not mention whether or not he was an employee of the Jacobsen Compa-

ny. Halvorsen testified he was in the employ of Jacobsen & Company which, he said, "holds the contract" with Long Beach. (The contract was held by Jacobsen individually.) No issue has been made on appeal as to whether Jacobsen or his company would be liable for Halvorsen's negligence. So as to Jacobsen individually or corporately, we leave them where we found them—the interlocutory decree in effect against both of them.