**NATIONAL DEVELOPMENT COMPANY, a corporation, et al., Libelants,**

v.

**CITY OF LONG BEACH, a municipal corporation; Sigurd A. Ougland, and J. A. Jacobsen & Company, Inc., a corporation, Respondents.**

No. 808–57–TC.

United States District Court
S. D. California,
Central Division.
March 21, 1960.

Lillick, Geary, McHose, Roethke & Myers, Los Angeles, Cal., by William A. C. Roethke, and Kenneth E. Kulzick, Los Angeles, Cal., for libelant, National Development Co.

Ekdale & Shallenberger, San Pedro, Cal., by Arch E. Ekdale, San Pedro, Cal., and Wahlfred Jacobson, City Atty., Long Beach, for City of Long Beach.

John R. Nimocks, Deputy City Atty., Palo Alto, for respondents.

McCutchen, Black, Harnagel & Shea, and Howard J. Privett, Los Angeles, Cal., John F. McCarthy, Long Beach, Cal., for co-libelants, Aetna (Fire) Ins. Co., and others.

**THURMOND CLARKE, District Judge.**

This action is the result of the grounding of the Dona Aurora, a vessel owned by libelant National Development Company, Inc., on a breakwater belonging to the City of Long Beach. The casualty occurred as Dona Aurora was entering the harbor of Long Beach. We have concluded that Sigurd A. Ougland, a pilot furnished by the City of Long Beach through a contract subsisting between the City and J. A. Jacobsen & Company, Inc. had taken the conn of the vessel some fifteen minutes prior to the grounding. The atmospheric conditions on the day of the casualty were befogged in fact and in the testimony as to the fact. We conclude that visibility in the general area of the harbor entrance was patchy, with areas of relatively clear air, and other areas of rather dense fog; but that visibility in the immediate vicinity of the harbor entrance, near the west breakwater light, was "practically zero"; and that these conditions were changing with the passage of time, tending toward greater fogginess. The navigational resources available to the pilot who had the conn of the Dona Aurora consisted of the Long Beach shore-based radar; the Chief Mate as a lookout stationed in the forward part of the ship, who never reported anything to the bridge, save reporting the breakwater light as soon as seen prior to the instant of the grounding; the ship's radar, which we find to have been functioning at all relevant times; and the personnel, including the pilot and the master of the vessel, who were stationed at the bridge. Initially, there was pilot communication with the Long Beach shore-based radar. This facility of the respondents is of an advanced type, which would have greatly assisted in the navigation when visual means were rendered useless. This communication was interrupted before it could be of much use, by causes unknown, and this interruption was known to respondents, but was unknown to the Master and could have been corrected by the respondents.

■■ Primary responsibility for the direction and navigation of the Dona Aurora having been found to be attributable to the pilot, Ralli v. Troop, 157 U.S. 386, 402, 15 S.Ct. 657, 39 L.Ed. 742, there necessarily arises a presumption that errors resulting in the grounding are elements of negligence chargeable to him. Matheson v. Norfolk & North American Steam Shipping Co., 9 Cir., 1934, 73 F.2d 177. It is not necessary to predicate our decision in this matter upon mere presumptions however; a number of acts and omissions by respondents' pilot constituted negligence of a most palpable kind. We find that the pilot's choice of an oblique course in approaching the harbor entrance, under the then existing atmospheric conditions, and when there was no contact with shore-based radar, was adventurous, risky and unnecessary, in view of the fact that there was no urgent need for the ship to enter the harbor immediately, and furthermore an alternative means of contacting the shore-based facility existed which should have been known to a person with the skills of a pilot; to-wit, radio relay through the Long Beach Pilot Boat. Placing the vessel in his conn under such risk was an act of negligence on the part of the pilot. Indeed, we would have to find negligence in the choice of courses even in the absence of the radar element, since the pilot himself testified that a less perilous course could have been taken when the fog conditions were seen to be rather dense around the entrance to the harbor—a course due north, or 360°, lining the ship up visually with the entrance buoy which lies one mile due south of the harbor entrance.

■ Respondents contend that whatever the risk involved in the choice of courses, libelants were also negligent and their negligence proximately caused the casualty. It is maintained that the master of the Dona Aurora was instructed to, and did purport to man the ship's radar, assisting the pilot in his navigation by that means. It is also contended that had the radar been properly manned by a competent observer, the danger of the

ship's course would have been quite apparent. We accept this latter contention as a matter of fact, but we note that the pilot himself looked at the radar and find that the pilot did not have the ship's radar continuously manned by the master, or anyone else. It is also contended that not only did the master of the ship fail to diligently perform the task he undertook, but that he positively misled the pilot on several occasions when asked "how she looked." On this point there is a direct conflict in the testimony, and we shall find that the master was correct in asserting that he was not instructed to observe the radar, and that the radar on the ship was not being relied upon by the pilot in his navigation of the ship. Apparently it was felt by the pilot that the ship could be brought in easily by heading for the end of the breakwater and then navigating by the sound of the foghorn there located. Nor do we find that the reliance by the master upon the pilot's apparent command of the situation, as a matter of foresight, was an act of negligence although to be sure the master had the power of relieving the pilot if he apprehended a situation of imminent danger to the vessel. Union Shipping & Trading Company v. U. S., 2 Cir., 1942, 127 F.2d 771, and cases cited.

██ In this connection, the pilot also charges the ship's lookout with negligence for failing to report various sounds and sightings. Upon careful examination and re-examination of this claim we again note that the conditions of visibility at the breakwater entrance rendered visual means of navigation useless. In failing, by any means, to report foghorn sounds, which the pilot himself heard, the lookout performance may be questioned. The lookout could not distinguish the sounds, or their location. Although we are impressed with respondents' contention that such a failure can be a very grave one in the law of admiralty, The Ariadne; 13 Wall. 475, 80 U.S. 475, 20 L.Ed. 542; The Madison, 2 Cir., 1918, 250 F. 850, we note, however, that any such dereliction of the lookout must have come to the attention of the pilot long before the ship was in a condition of inextricable peril. Proper pilotage, we believe, would have required the pilot to take measures designed to remedy the claimed lookout defect promptly. There was no dereliction connected with the actual grounding because, at the time, the Chief Mate (who was acting as lookout) made the best report possible. The conditions of visibility, as earlier noted, rendered a visual sighting useless. Also, nothing would have been different if the lookout had reported foghorns which he heard, but could not identify, because it is clear that the pilot did not desire such reports and was, in fact, relying on hearing the breakwater foghorn himself "on the bridge." The concluding sentence of the pilot's official report of the grounding to the U. S. Coast Guard, (Exhibit 11), states:

> "During all the time in question, the ship maintained a lookout on the bow and continuously sounded fog signals."

It is evident that even the pilot, most interested in exculpating himself, did not charge any significant failure to lookout performance. In short, even if he held a lookout to the high performance of reporting horns he could not identify, such a deficiency would not be significant here where it was unrelated to the grounding. On the issue of lookout, we therefore conclude that any deficiencies or faults did not contribute to the grounding.

The pilot asserts in his defense that the course chosen by him, although less safe perhaps than a due north course, was nevertheless a prudent and adequate one, if duly carried out by the crewmen of the vessel. Testimony was adduced to show that the pilot first set the course at 320°, and some time thereafter ordered 330°. There was sharp conflict as to the possibility that the casualty may have resulted from helmsman's negligence in allowing the Dona Aurora to follow a course of 325° instead of the 330° set by the pilot. In the absence of any convincing evidence that a course of 325° was

ever followed by the vessel, we must conclude that the course taken was indeed 330°, conceding that the difference of 5° if it existed may have been the margin between a collision and a non-collision course. There is a further reason why this line of speculation cannot be seriously entertained by the court, and that is that we are totally in the dark as to what may or may not have been collision courses absent data at fixed points of time on the morning of the casualty as to the position of the ship. We have no way of knowing how far the Dona Aurora had proceeded along a course of 320° before it angled off at 330°. The Domira, D.C. E.D.N.Y.1931, 49 F.2d 324, 328. More important, neither did the pilot know, although one of his duties in these circumstances would be to determine with nicety, the location of his vessel. It is therefore quite possible that the courses set by the pilot were collision courses, and in the light of the event, we so find.

Having indicated the pilot's responsibility for the grounding of Dona Aurora, we must now establish who are to bear the financial responsibility for the incident. At the outset, we must consider respondents' argument that as a matter of law, the master of the Dona Aurora was solely responsible for the conduct of his ship until such time as it entered the waters for which the pilot was licensed. In other words, we are told that no matter how strongly we are convinced that a navigator was acting in fact as pilot, he can be deemed no more than an expert advisor and assistant to the master when the vessel is still in territorial waters outside the harbor for which the pilot's license is issued. Libelants meet this line of attack with City of Long Beach v. American President Lines (The President Van Buren), 1955, 223 F.2d 853. In that case, the pilotage at the time of the casualty occurred in the waters of Los Angeles Harbor, for which the pilot was licensed, although he was an agent of Long Beach, usually discharging his duties in the harbor of Long Beach. The case, therefore, has no square holding as to the question whether pilotage can exist in waters beyond the boundaries of the pilot's license; it does hold that responsibility for negligence in pilotage can be charged to the pilot's superiors even though the negligence occurred beyond the jurisdiction of the superiors to compel pilotage services. The case also held (whether by stipulation or not, we are ignorant) that the Long Beach harbor is a compulsory pilotage harbor, which we find amply supported in the situation of libelant by a reading of the tariff of that port. We find that compulsory pilotage within the waters of Long Beach Harbor applied to the Dona Aurora in this case. Thus the Van Buren as we read it justifies our holding respondents liable on a respondeat superior and a contractual theory provided the pilot was engaged professionally at the time of the casualty. We have no doubt that this was the case, legally and practically speaking; the Van Buren itself implicitly recognizes that pilotage as a matter of law begins at the point where sound seamanship requires it, and not at the point designated by geographers as the natural or artificial boundary of a harbor, nor by the State or its political subdivisions as the limit of civic jurisdiction. The venerable William Law, D.C., 14 F. 792, cited by libelants, is an example of judicial recognition of this fact, holding that refusal on the part of the ship's master of pilotage by a ship outside the breakwater was actionable. And in the Van Buren the Ninth Circuit stated [223 F.2d 857]:

> "We think we should not haggle over the intervening distance between the point where the compulsory pilot takes over to perform his duty of bringing the ship into Long Beach Harbor so long as the performance begins within a reasonable distance of the Long Beach border."

The "reasonable" distance, we think, should be dictated by principles of seamanship, and in this respect the common practice of pilots meeting ships at the entrance buoy one mile south of the entrance of Long Beach Harbor is to our mind eminently reasonable.

Our conclusion, therefore, is that respondents are liable for the grounding of the Dona Aurora; that libelant National Development Company is not at fault in the grounding of said vessel; and that findings of fact and conclusions of law consistent with this opinion should be prepared by the proctors for libelants. It is the understanding of the Court that this determination will allow cargo on the Dona Aurora, which appeared herein as co-libelants, to recover in full from the respondents.