**UNITED STATES of America, Plaintiff and Appellee,**

**v.**

**SS PRESIDENT VAN BUREN, etc., et al., Defendants.**

**AMERICAN PRESIDENT LINES, LTD., Defendant, Third-party Plaintiff and Appellant,**

**v.**

**CITY OF LONG BEACH, Third-party Defendant and Appellee.**

No. 71–2735.

United States Court of Appeals, Ninth Circuit.

Dec. 13, 1973.

Rehearing Denied Feb. 20, 1974.

---

Jack D. Fudge (argued), of McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for appellant.

William D. Keller, U. S. Atty., Los Angeles, Cal., Allan J. Weiss (argued), of Admiralty & Shipping Section, Dept. of Justice, San Francisco, Cal., Gordon P. Shallenberger (argued), of Ekdale & Shallenberger, San Pedro, Cal., for appellee.

Before DUNIWAY and GOODWIN, Circuit Judges, and MURRAY,* District Judge.

Alfred T. GOODWIN, Circuit Judge:

American President Lines, Ltd., challenges in this ship-collision case district court orders which dismissed its cross-claim against a pilot and its third-party complaint against the City of Long Beach. The court ruled that the tariff of the Port of Long Beach provided for noncompulsory pilotage services and that the exculpatory provisions of this tariff were valid. We agree with these conclusions, and affirm.

On the morning of July 5, 1968, while the government-owned USS Capacon was moored in its berth in Long Beach inner harbor, American President Lines re-

---

* The Honorable William D. Murray, Senior United States District Judge for the District of Montana, sitting by designation.

quested the port to furnish pilotage services to the SS President Van Buren for a movement into the inner harbor. Municipal Pilot Carl Aultman boarded the President Van Buren and assumed his duties. The President Van Buren, while proceeding under pilotage, collided with the Capacon, damaging both vessels.

The United States subsequently filed its complaint against the President Van Buren, in rem, and against American President Lines and Carl Aultman, in personam, to recover the damages sustained by the Capacon. No service was accomplished in the in-rem proceeding, and that action has been dormant pending resolution of this one.

American President Lines (APL) denied liability and counterclaimed against the United States for property damage sustained by the President Van Buren. APL also filed a cross-claim against Aultman, and a third-party complaint against the Port of Long Beach and Jacobsen Pilot Services, Inc., the pilotage contractor which, pursuant to its contract with the port, had placed Aultman aboard the President Van Buren.

The district court, sitting in admiralty, without a jury, awarded the United States its full damages against APL. The court dismissed the government's complaint against Aultman, APL's counterclaim against the government, APL's cross-claim against Aultman, and APL's third-party complaint against Long Beach and Jacobsen. These rulings raise two issues.

■ The first question is whether Aultman was a noncompulsory pilot. If so, he was in much the same position as one of the ship's officers. Under the or-

dinary rules of *respondeat superior*, the shipowner would be responsible for Aultman's actions. If, on the other hand, the district court had concluded that pilotage was compulsory, the *respondeat superior* nexus would have been broken, and APL would not be personally liable for the results of the pilot's negligence. *See* Homer Ramsdell Transportation Co. v. La Compagnie Generale Transatlantique, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901); G. Gilmore & C. Black, The Law of Admiralty 429–30 (1957).

■ The tariff of the Port of Long Beach, under which Aultman boarded the President Van Buren, on its face provides for optional pilotage services to vessels entering, leaving, or shifting within the port.[1] However, if a vessel subject to the payment of pilotage elects not to take aboard a municipal pilot, an assessment of three quarters of the applicable charge is payable to the port.[2] APL argues that this financial inducement makes compulsory the use of the port's pilots.

In The China, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67 (1869), the Supreme Court held that under a New York statute which made the master liable for the payment of full pilotage even if he chose to proceed without one, vessels were compelled to take a pilot. The Court further held, however, that, even though the shipowner was not liable in personam, the vessel itself still was liable in rem.

Three years later, in The Merrimac, 81 U.S. (14 Wall.) 199, 20 L.Ed. 873 (1872), the Court said:

" * * * State pilot laws which compel the owners of vessels to pay

---

1. Port of Long Beach, Tariff No. 3, Item No. 205 (1967):

"(a) The City of Long Beach maintains a force of municipal pilots, pursuant to a contract with an independent pilotage contractor, to perform the service of piloting vessels within, into and out of the Port of Long Beach. Any vessel entering, leaving or shifting within the Port of Long Beach may, but is not required to, request the services of and be piloted by a municipal pilot. Such

pilotage services are understood to be voluntarily requested and voluntarily rendered."

2. Port of Long Beach, Tariff No. 3, Item No. 215(a), Exception 1 (1967):

"Three-fourths (¾) the applicable charge, including minimum or maximum charge, shall be assessed when vessel subject to the payment of pilotage is not piloted by a municipal pilot."

half-pilotage in cases where the pilot offers his services and they are refused, where the law is not enforced by any penalty, are not regarded as compulsory, and therefore, the fact that the vessel was in charge of a pilot under such a law at the time of the collision is no defence to a libel for damages, if it appears that the collision was occasioned by negligence or unskilful navigation * * *." 81 U.S. at 203.

This holding was cited in dicta in the Supreme Court's most recent opinion on the subject of compulsory pilotage. Homer Ramsdell Transportation Co. v. La Compagnie Generale Transatlantique, 182 U.S. at 415, 21 S.Ct. 831.

The trial court correctly relied upon the portion of *The Merrimac* quoted above, even though this court had held that an earlier version of the tariff of the Port of Long Beach provided for compulsory pilotage. National Development Co. v. City of Long Beach, 187 F. Supp. 109, 113 (S.D.Cal.1960), aff'd, 289 F.2d 586 (9th Cir.), cert. denied, 368 U. S. 901, 82 S.Ct. 177, 7 L.Ed.2d 95 (1961); City of Long Beach v. American President Lines, Ltd., 223 F.2d 853, 856 (9th Cir. 1955). Neither of our cases would support a holding today that the pilotage is compulsory. The Long Beach tariff has been significantly amended. The earlier version provided that "all vessels entering and leaving, and shifting within, the Port of Long Beach * * * *must* be piloted by a municipal pilot * * *." [3] (Emphasis added.) Its current version, by contrast, purports to provide that pilotage is completely voluntary. *See* note 1, *supra*.

The three-quarter charge on vessels that elect not to take on a muncipal pilot, the port explains, is assessed in order to generate needed revenues to help defray the many costs of operating a major port. We have no basis for holding this explanation to be unreasonable. *Cf*. Cooley v. Board of Wardens of Port of Philadelphia, 53 U.S. (12 How.) 299, 311–314, 13 L.Ed. 996 (1851).

Accordingly, we hold that Aultman was a noncompulsory pilot for the purposes of fixing the *respondeat* liability of the owner of the vessel under pilotage. The court correctly held APL responsible for the damages sustained by the Capacon.

Having agreed with the trial court that pilotage was noncompulsory, we come to the second issue: are the sweeping immunity provisions of the tariff of the Port of Long Beach valid?

■ Normally, a pilot is personally liable for his own negligence, and his employers are responsible for his actions under the rules of *respondeat superior*. *See* G. Gilmore & C. Black, *supra* at 430–32; A. Parks, Law of Tug, Tow and Pilotage 484 (1971).

■ In this case, the tariff of the Port of Long Beach provided that pilotage services are furnished on the understanding that the pilot is acting as the servant of the vessel, and that the vessel and its owners agree not to assert any liability against the pilot, Long Beach, the Board of Harbor Commissioners, and the pilotage contractor, and to hold those parties harmless with respect to any liability arising out of the negli-

---

3. Port of Long Beach, Tariff No. 3, Item No. 205 (amended 1967):

"(a) The City of Long Beach, acting through its Board of Harbor Commissioners, the governing body of the Port of Long Beach, maintains a force of pilots duly licensed to perform the service of piloting vessels in the Port of Long Beach, and all vessels entering and leaving, and shifting within, the Port of Long Beach, not exempt from the payment of pilotage, must be piloted by a municipal pilot, except that any such vessel may be piloted by the bona fide master thereof, if such master holds a federal pilot's license for the Port of Long Beach and excepting, further, that, if necessary, any such vessel may be piloted by the bona fide master thereof into the Port of Long Beach to anchor in the outer harbor to await the services of a municipal pilot."

gence of the pilot except such personal liability as may arise by reason of the willful misconduct or gross negligence of the pilot.[4] APL argues that these exculpatory provisions are void, as against public policy, and unconstitutional.

Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932), enforced a contractual clause very similar to the one at issue here. The clause in *Sun Oil* provided that a tug captain who piloted a vessel propelled by its own power should be considered the servant of that vessel and that the tug owners should not be liable for his negligent pilotage. 287 U.S. at 292–293, 53 S.Ct. 135.

Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), distinguished *Sun Oil,* and held invalid an exculpatory contract designed to relieve a tugboat owner from liability for negligent towage of a dead ship:

"* * * It is one thing to permit a company to exempt itself from liability for the negligence of a licensed pilot navigating another company's vessel on that vessel's own power. That was the *Sun Oil* case. It is quite a different thing, however, to permit a towing company to exempt itself by contract from all liability for its own employees' negligent towage of a vessel * * *." 349 U.S. at 94, 75 S. Ct. at 634.

APL argues, however, that the controlling distinction between Sun Oil and *Bisso* is not the difference between a live ship and a dead tow, but rather the degree of disparity in the relative bargaining positions of the parties. APL points particularly to the statement in *Sun Oil* that:

"* * * Respondent had no exclusive privilege or monopoly in respect to the services that petitioner desired to have performed for its tanker. And petitioner was under no compulsion to accept the terms of respondent's pilotage clause. There is nothing to suggest that the parties were not on equal footing or that they did not deal at arm's length * * *." 287 U.S. at 294, 53 S.Ct. at 136.

APL concludes that, unlike the contract involved in *Sun Oil,* but like that in *Bis-*

4. Port of Long Beach, Tariff No. 3, Item No. 205 (1967):

"(e) It is understood and agreed, and is the essence of the contract under which pilotage services are proffered and rendered, and are requested and accepted by the vessel, that the services of the pilot are requested and accepted on the express understanding that such pilotage services are given, done or performed solely in the pilot's capacity as the servant of the vessel and of her owners, master, operators, charterers or agents, and not otherwise, and the owners, master, operators, charterers and agents of the vessel expressly covenant and agree to comply with the provisions of paragraphs (c) and (d) of this Item 205 and not to assert any personal liability against the pilot or the City of Long Beach, the Board of Harbor Commissioners, or any of their officers, employees or pilotage contractor, to respond in damage (including any rights over) arising out of or connected with, directly or indirectly, any damage, loss or expense sustained by the vessel, her owners, master, operators, charterers, agents or crew, and by any third parties, even though resulting from acts, omissions or neglience of the pilot; and provided, further, that to the extent only to which liability is legally imposed against the vessel, taking into consideration any limitation thereof to which the vessel or its owners, master, operators, charterers or agents are entitled by reason of any contract or bill of lading, or of any statute or rule of law in force, such vessel and her owners, master, operators, charterers and agents further covenant and agree to indemnify and hold harmless said pilot, the City of Long Beach, the Board of Harbor Commissioners, and each of their officers, employees and pilotage contractor, in respect to any liability arising out of claims, suits or actions against the municipal pilot, the City of Long Beach, the Board of Harbor Commissioners, or any of their officers, employees or pilotage contractor, or by third parties, resulting from acts, omissions or neglience of said pilot, excepting, however, such personal liability and rights over as may arise by reason of the willful misconduct or gross negligence of the pilot * * *."

*so*, the port's tariff here is adhesive in light of the relative bargaining positions of the parties and should be held invalid.

However, the exculpatory provisions of the Long Beach tariff are integrated within a pilotage scheme which we have held to be noncompulsory. APL was not forced to use a municipal pilot, and in this sense it was not compelled to accept the exculpatory provisions of the port's tariff.

Moreover, Long Beach had anticipated APL's argument by making available to owners of piloted vessels "trip insurance" at a nominal charge of $4.50 per trip in addition to the pilotage fee. A steamship company can purchase in advance insurance covering all movements of its ships within the harbors of Long Beach and Los Angeles while piloted by municipal pilots, or a shipowner can purchase insurance solely for a specific ship movement. If not arranged earlier, the ship's master or agent can request single-trip insurance from the pilot himself at the time he boards the vessel. The insurance offered covers the legal liability for negligent acts or omissions of pilots furnished by Long Beach. In effect, then, Long Beach has offered two types of pilotage—one for an uninsured passage at a fixed rate, and the other for an insured passage at a slightly higher rate. APL had a free choice between uninsured and insured pilotage, and it chose the former.[5] To quote from *Sun Oil*: "It would be unconscionable for petitioner upon occurrence of a mishap to repudiate the agreement upon which it obtained the service." 287 U.S. at 295, 53 S.Ct. at 136.

Because of the voluntary nature of the pilotage, and the availability of trip insurance at a nominal cost, the provisions of the tariff of the Port of Long Beach exculpating the pilot and his employers from liability are valid and enforceable.

The judgment is affirmed.

5. For an interesting discussion of the economics of pilotage insurance, and statutory efforts to institutionalize exculpatory tariffs, see A. Parks *supra* at 484–489.