## SUN OIL CO. v. DALZELL TOWING CO., Inc.
## No. 114.

Circuit Court of Appeals, Second Circuit.

Jan. 11, 1932.

Duncan & Mount, of New York City (Frank A. Bull, of New York City, of counsel), for appellant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUS-TUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

In May, 1925, the respondent was employed by the libelant to take its steamship Sabine Sun from Staten Island to Bergen Point, N. J. While proceeding through the Kill von Kull, accompanied by three of respondent's tugs, the captain of one of which was on the bridge of the steamer in the role of pilot and directing her helm and engine movements, the steamer grounded at a point which the District Court found to be outside the channel. To recover the damages thus sustained this suit was brought. The Sabine Sun was proceeding under her own steam, and the tugs were exonerated because none of them contributed in any way to the grounding. The appellant has assigned no error to the dismissal of the libel as to them. The respondent also was exonerated, on the ground that its contract of employment put the risk of the tug captain's alleged negligence (assuming that he was negligent) upon the tow. This ruling the appellant vigorously attacks. Two questions are presented: (1) Whether the contract did contain a provision putting the risk on the tow; and (2), if it did, whether such a provision is valid.

The contract was oral, and, as is usual in towage cases, consisted merely of an order telephoned by the tow owner and accepted by the tug owner, so that the full terms of the contract must be spelled out by the court from the previous dealings of the parties. On May 14, 1925, Mr. Turnbull, the assistant marine superintendent of Sun Oil Company, called the office of Dalzell Towing Company by telephone, and requested that on the following day they take the Sabine Sun from Stapleton to the dock of the Texas Oil Company at Bergen Point. The respondent's agent replied that they would be ready to take her about 1:30 p. m. That was all of the conversation. Nothing was said about pilotage, but Mr. Turnbull understood that his vessel would move under her own steam and that one of the tugboat captains would come upon her bridge and take charge as pilot. The parties had previously done business together, and on three prior occasions the respondent had mailed to the libelant a printed document entitled, "Pro Forma Towage Rates and Contract with Dalzell Towing Company," which contained a final paragraph reading as follows:

"Pilotage

"When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power goes on board said vessel, or any other licensed pilot goes on board said vessel, it is understood and agreed that said tugboat captain or licensed pilot becomes the servant of the owners of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents or charterers shall be liable for any damage resulting therefrom."

This had been sent to libelant's Philadelphia office on November 15, 1923, with a letter calling special attention to the pilotage clause. A second copy was sent to libelant's office at Marcus Hook, Pa., on December 28, 1923, and a third copy was again sent to that office on June 10, 1924. In letters accompanying the two copies last mentioned, reference was made by respondent to its schedule of towage rates, and it was asserted that bills which were being questioned by the libelant were in accordance therewith. The correspondence of June, 1924, was with Mr. Turnbull himself, who admitted that he had before him at the time a bill of respondent upon the face of which is printed the pilotage clause. Another bill bearing the same clause was also put in evidence, and Mr. Turnbull testified that he saw such bills "right along" and had "heard of" the pilotage clause, although he denied that he had ever actually read it until asked to do so at the trial. Whether he had actually read the clause and whether it was in his mind when he telephoned the order for tugs for the Sabine Sun is quite beside the point. The meeting of the minds of the parties to a contract is not determined by a subjective test. Mr. Turnbull's offer on behalf of the libelant, which the respondent accepted, must be interpreted in the sense in which the party using

the words should reasonably apprehend that they would be understood by the other party. 2 Williston, Contracts, § 605. Knowing that the respondent had a schedule of rates and a pilotage clause, the importance of which had been stressed not only in the letter of November 15, 1923, but also by printing it on its billheads, the libelant should reasonably apprehend that its telephone order for tugs would be understood by respondent as a request that they be furnished upon its customary terms as to rates and pilotage. The court below rightly held that the contract between the parties included the pilotage clause as one of its terms. See Ten Eyck v. Director General, 267 F. 974 (C. C. A. 2); The Cutchogue, 10 F.(2d) 671 (C. C. A. 2); Graves v. Davis, 235 N. Y. 315, 139 N. E. 280. Cases relied upon by the appellant are distinguishable, for in them the tug owner's notice was not shown to have been received by any responsible agent of the owner of the tow. See McWilliams Bros. v. Davis, 285 F. 312 (C. C. A. 2); G. Robitzek & Bros. v. Davis, 296 F. 107 (C. C. A. 2); Calzavaro v. Planet S. S. Corp., 31 F.(2d) 885 (C. C. A. 4).

The appellant argues that, even if the pilotage clause was a term of its contract with respondent, the case at bar was not brought within it, but the argument is wholly without merit. It is mentioned merely to indicate that it has not been overlooked.

■ We pass to the contention that the pilotage clause is invalid in so far as it attempts to put upon the tow the risk of the tug captain's negligence while acting as pilot of the vessel as she proceeded under her own power. The authorities relied upon are a statement of Mr. Justice Davis in The Syracuse, 12 Wall. 167, 171, 20 L. Ed. 382, and a recent decision by the late Chief Justice Taft in which that language was repeated. Compania de Navegacion v. Fireman's Fund Ins. Co., 277 U. S. 66, 73, 48 S. Ct. 459, 72 L. Ed. 787 (for convenience hereafter referred to as The Wash Gray). After an elaborate consideration of the question, this court decided that an agreement by the tow to assume all risks was effectual to release the tug from liability for its negligence, because a tug is not a common carrier in its relation to the tow. The Oceanica (C. C. A.) 170 F. 893. Judge Ward's comments on the meaning of Mr. Justice Davis' statement in The Syracuse, and the reasons advanced for thinking it not controlling upon this court need not be here repeated. The authorities have been collected and ably discussed in the Pacific Maru, 8 F.(2d) 166

(D. C. S. D. Ga.). Many have reaffirmed the rule laid down in The Oceanica, and it has become so firmly established in this circuit and rests, as it seems to us, upon reasoning so sound, that we should not think of departing from it unless the later Supreme Court case clearly demands it. That question, however, is not now presented, for the decision in The Wash Gray is clearly distinguishable, in our opinion, from the case at bar.

The Wash Gray did not involve a pilotage clause. It was a case in which a steamship contracted to tow a tugboat (The Wash Gray) from Tampico to Galveston under a contract which provided that the steamer "is not responsible in any way for loss or damage to" the tow. The tow was lost at sea, and in a suit against her hull underwriters a defense was interposed that the release of the towing vessel, undisclosed to the underwriters, vitiated the insurance. In holding that it did not, Chief Justice Taft said that the contract did not release the towing vessel from liability for negligence of its master or crew, and quoted from The Syracuse. Whether the opinion be read as meaning that the contract as drawn should be construed as not intended to embrace negligence (as the appellee contends) or as meaning that a contract which attempts to release a towing vessel from liability for negligence is invalid (as the appellant contends), it does not, upon either alternative, control decision of the problem before us. If the opinion lays down only a rule of construction, it is too clear for argument that it does not apply to the pilotage clause in suit which indubitably expresses the intention to put upon the "assisted vessel" the risk of the pilot's handling of her. If, on the contrary, the opinion lays down the rule that a towing vessel cannot release herself from liability for negligence, however clearly that intention be expressed in the contract of towage, a distinction may well be taken between a towage contract as such and a pilotage contract. When a tug owner is engaged in towing a dead vessel, he may limit his liability to the value of his tug. It is conceivable (although we should not so decide unless constrained by controlling authority) that, having granted the privilege of limited liability, the law forbids a towing company from gaining complete exemption from liability if the tug is at fault. But when the "assisted vessel" is under her own power and the towing company merely supplies a tug master as a pilot, there is no maritime lien upon the tug for the errors of the pilot [The Sarnia, 261 F. 900 (C. C. A. 2)] and no limitation of liability of the tug owner. We can

conceive of no reason why the person who merely supplies a pilot should not be able to say to the vessel-owner: "I will furnish a man believed to be competent but you must assume the risk of his errors." If this cannot be done, the piloting company may readily be wiped out by a single disaster. Believing that The Wash Gray opinion does not preclude a decision that the pilotage clause in question is valid, we affirm the holding of the District Court to that effect. This makes it unnecessary to consider whether or not Captain Fort was in fact negligent in stranding the vessel.

Decree affirmed.