358 F.2d 896
 TANKERS AND TRAMPS CORPORATION, Libellant-Appellee-Cross-Appellant,
v.
TUGS JANE McALLISTER and MARGARET M. McALLISTER, their engines, boilers, etc., McAllister Brothers, Inc., Respondent-Appellant-Cross-Appellee, and
Pilot L. Daisey, Respondent-Appellee.
 No. 270.
 Docket 29254.
 United States Court of Appeals Second Circuit.
 Argued March 10, 1966.
 Decided April 18, 1966.
 
 Christopher E. Heckman, New York City (John H. Hanrahan, and Foley & Martin, New York City, on the brief), for respondent-appellant.
 Theodore P. Daly, New York City (Melvin J. Tublin, and Poles, Tublin & Patestides, New York City, on the brief), for libellant-appellee.
 Before SMITH, HAYS and ANDERSON, Circuit Judges.
 J. JOSEPH SMITH, Circuit Judge.
 
 
 1
 The United States District Court for the Southern District of New York, Richard H. Levet, District Judge, sitting in admiralty, entered an interlocutory decree holding liable McAllister Brothers, Inc., which furnished two tugs and a pilot to assist libelant's tanker SS Atlas, for damages to the tanker due to grounding in the Kill van Kull, on a voyage from Stapleton anchorage to a terminal at Linden, New Jersey on the morning of November 24, 1958. The court found that the grounding was caused by pilot error, held McAllister as employer of the pilot, exonerated the tugs and dismissed as to pilot Daisey, who had not been served with process. McAllister Brothers, Inc. appeals from the decree against it and libelant appeals from the decree so far as it dismissed the action against the Tug Margaret M. McAllister. We find no error and affirm the decree.
 
 
 2
 There is no doubt that the grounding and resultant damage to the Atlas were due to the negligence of Daisey who navigated the Atlas out of the travelled portion of the channel and onto the mud bank outside the channel in spite of repeated warnings by the Master of the Atlas on radar observation that he was getting too far to port. Nor is there any question but that Daisey was furnished as a pilot by McAllister and had been in McAllister's employ as a pilot for some 14 years. He was paid a salary by McAllister and a fee by Cargo and Tankship, agent for SS Atlas. McAllister's claim of non-liability depends on the provisions of a New York Harbor Pilotage Clause,[1] which, if applicable would make the pilot furnished by the tug owner the employee of the vessel (Atlas) or its owners, and make it or them liable for his negligence.
 
 
 3
 The towage and pilotage in question were arranged the day prior to the grounding by telephone communication between Cargo and Tankship Management, the agent for the SS Atlas, and McAllister's tug dispatcher. Nothing was said in that conversation with regard to the New York Harbor Pilotage Clause or any similar limitation of McAllister's liability. There was nothing said, so far as appears, which made the pilot subject to the direction of Tankers and Tramps as to the manner in which he should carry out his piloting duties.
 
 
 4
 The "pilotage clause" was, however, included below the signature line on the tug assistance slip or receipt signed by Atlas' master after the grounding. It appeared likewise on the bill rendered Atlas' agent for tug assistance, and paid by it, and appeared on a rate schedule in use by McAllister at the time. There was no evidence that libelant or Atlas' agent saw the printed schedule prior to the grounding. There was evidence that Atlas' agent had paid bills on which the clause was printed for services of McAllister to another vessel and for Atlas on one earlier voyage. There was no evidence that any claims had arisen because of pilot error on those voyages or that the clause had been discussed. There was no master contract in existence covering all tug assistance rendered libelant by McAllister.
 
 
 5
 A contract arose from the telephone conversation calling for the furnishing of the services. This is so even though there was no price specified, for a reasonable price was implied and the services were furnished. Williston on Contracts, 3rd Ed. Vol. 1, Sec. 41. Since the contract was complete at the time of the telephone conversation, the pilotage clause can defeat libelant's claim only if it was part of that contract, or if it was later agreed to in some subsequent addition to or substitution for the original contract. If prior dealings between the parties involving the clause were proved, an inference that it was a term of this contract might be justified. Sun Oil Co. v. Dalzell Towing Co., 55 F.2d 63, 64 (2 Cir.), aff'd 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932). The proof of such prior dealings as would justify such an inference is, however, lacking here. To be sure, there are circumstances which indicate that such a restrictive clause has been in use at times in the trade. The title of the clause, reference to it in a number of other cases, McAllister's printing of it on schedules, tug assistance slips and bills, all show that it has been utilized in such contracts, perhaps with some frequency in the trade in this harbor.[2] There was, however, no testimony that there was in fact use with such frequency as to justify a finding that such a transfer of liability was a custom in the trade, or in what percentage of New York Harbor towage contracts such a provision was included, or what knowledge Tankers had of any such custom. On the bill a 7½% discount is referred to. But there is no testimony or other evidence of any connection between the discount and the pilotage clause. Lacking any evidence that there was any custom or that McAllister's schedule was ever brought to libelant's attention and crediting testimony that no mention was ever made of such a limitation in the contract negotiations, the court declined to interpret the contract as containing such a limitation. In this the court was justified. An independent contractor agreeing to provide a pilot and assisting tugs to bring a ship to dock in waters familiar to the contractor normally assumes charge of and full responsibility for the job. The West Eldara, 104 F.2d 670, 671 (2 Cir. 1939). It was open to McAllister readily to prove a custom of the trade absolving such a contractor if it did in fact exist and if Tankers had knowledge of it.
 
 
 6
 To be sure, the master signed a tug assistance slip and Atlas' agent paid a bill for the services, both having printed at the foot the pilotage clause. But the master was confirming the date and time of the tugs' assistance, and denied he read the printing at the foot of the form, and there is no evidence that any responsible employee or officer of the agent did so. And, while it is true that one may in some circumstances by paying a bill liquidate the amount of consideration not already specifically agreed upon, Fuller v. Kemp, 138 N.Y. 231, 33 N.E. 1034, 20 L.R.A. 785, mere payment of the amount of a bill with a new major limitation on the terms of the contract appended thereto does not demonstrate agreement to the limitation as a modification of the original contract, under the circumstances shown here. Intention to agree to so important a revision, without consideration, accepting responsibility for heavy damages, after the grounding had taken place, was surely not likely.
 
 
 7
 Much is made of the fact that similar language was similarly placed in slips signed and bills paid by Cargo and Tankship for another vessel and for an immediately prior arrival and departure of Atlas. But, aside from the question in the case of the other vessel whether the agent's knowledge acquired outside the agency could bind its principal here, there is nothing to show that any discussion was had of the provision, or that claims were made under it, or that it was specifically brought to the attention of the agent with respect to the telephoned communications which formed the contract here, or, as noted above, that any custom of the port or of the trade made such a provision universally understood to constitute a part of such contracts of towage and pilotage.
 
 
 8
 In this state of the record, we cannot say that it was clearly erroneous for the court to find that the respondent McAllister had failed to establish that the pilotage liability clause was part of the contract between the parties as originally entered into. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954).
 
 
 9
 Nor was it clear error to hold that the payment of the bill by Cargo and Tankship, in the light of the failure to show any discussion of the clause appended thereto either in this case or the four earlier instances shown amounted either to a new and additional contract on behalf of Tankers and Tramps to waive claim for liability for the grounding, or sufficient evidence of intent at the time of the oral contract to be then bound by such an unexpressed waiver.
 
 
 10
 The cross appeal is equally without merit. Counsel merely speculated that the presence of the second tug would have prevented the grounding; and the trial court's conclusion that the negligent navigation by the pilot was the proximate cause of the damage to the tanker is fully justified by the facts and the evidence supporting them. See Compania Maritima S. L. v. Moran Towing & Transp. Co., 197 F.2d 607, 609 (2 Cir. 1952).
 
 
 
 Notes:
 
 
 [1]
 PILOTAGE — When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power goes on board such vessel, or any other licensed pilot goes on board such vessel, it is understood and agreed that such tugboat captain or licensed pilot becomes the servant of the owner(s) of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel(s), and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents or charterers, operators or managers shall be liable for any damage resulting therefrom
 With respect to vessels that are not owned by the person or company ordering the tugboat service, it is understood and agreed that such person or company warrants that it has authority to bind the vessel owner to all the provisions of the preceding paragraphs, and agrees to indemnify and hold us harmless, and also those furnishing the tugs and/or pilot, the tugs, their owners, agents, charterers, operators and managers, from all damages and expenses that may be sustained or incurred in the event and in consequence of such person or company not having such authority.
 
 
 [2]
 Compare The West Eldara, 101 F.2d 45 (2 Cir.), cert. den. sub nom. McAllister Towing & Tr. Co. v. American Diamond Lines, Inc., 308 U.S. 607, 60 S.Ct. 144, 84 L.Ed. 507 (1939), modified on rehearing 104 F.2d 670, 671 (2 Cir. 1939), in which the charterer was shown to be in possession of the towage schedule containing the pilotage clause, but the master was not shown to have knowledge of a custom to include the clause in docking agreements so as to bind the owner
 
 
 
 11
 HAYS, Circuit Judge (dissenting).
 
 
 12
 On November 23, 1958, Cargo & Tankship Management Corporation, agents for the vessel Atlas, telephoned McAllister Brothers, Inc. and requested them to provide tugs and furnish a pilot so that the Atlas could dock at Linden, New Jersey on the following morning. The district court found that the Atlas went aground and sustained considerable damage as a result of the negligence of the pilot provided by McAllister.
 
 
 13
 Appellant, McAllister Brothers, Inc., sends tugs and licensed pilots to assist vessels in docking in the port of New York. As in Sun Oil Co. v. Dalzell Towing Co., 55 F.2d 63, 64 (2d Cir.), aff'd, 287 U.S. 291, 53 S.Ct. 135 (1932), so in this case, "the contract was oral, and, as is usual in towage cases, consisted merely of an order telephoned * * * [by appellee's agent to appellant], so that the full terms of the contract must be spelled out by the court from the previous dealings of the parties."
 
 
 14
 On at least four previous occasions Cargo and Tankship had received and paid bills from McAllister containing the following clause:
 
 
 15
 "Pilotage — When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power, goes on board said vessel or any other licensed pilot goes on board such vessel, it is understood and agreed that said tugboat captain or licensed pilot becomes the servant of the owner of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tug and/or pilot nor the tugs, their owners, agents or charterers shall be liable for any damage resulting therefrom."
 
 
 16
 On two occasions prior to the accident, viz., on November 12 and 13, 1958, the master of the Atlas had signed a slip containing the pilotage clause, and the appellant's bill for services also containing that clause was paid by Cargo and Tankship. There is nothing in the record to indicate that appellee's agent ever objected to the pilotage clause or asserted that it was not applicable to them.
 
 
 17
 This history of prior dealings is enough to establish that the parties intended the pilotage clause to be incorporated into the oral contract.
 
 
 18
 After the Atlas had gone aground, the master of the vessel signed a tug assistance slip containing the pilotage clause and Cargo and Tankship paid a bill for services containing the clause. The costly accident must surely have directed the attention of appellees to the question of liability and therefore to the pilotage clause with which they were without doubt already familiar. Without commenting upon or protesting about the pilotage clause, the master signed the slip and the appellees paid the bill. The slip and the bill both contained the terms and conditions of the contract into which the appellees entered by signing.
 
 
 19
 I must respectfully dissent.