[L.A. No. 31387. May 24, 1982.]

SOCIETA PER AZIONI DE NAVIGAZIONE ITALIA, Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Appellant.

448

## COUNSEL

Lillick, McHose & Charles and Francis J. MacLaughlin for Plaintiff and Appellant.

Burt Pines and Ira Reiner, City Attorneys, James H. Pearson and Jerome Montgomery, Sr., Assistant City Attorneys, and Raymond P. Bender, Deputy City Attorney, for Defendant and Appellant.

## OPINION

**BIRD, C. J.**—This maritime case presents a number of questions. (1) Which appellant must bear the ultimate liability for collision damage proximately caused by the negligence of a municipal harbor pilot? (2) May the City of Los Angeles (City) avoid liability by invoking the "borrowed servant" doctrine? (3) Are the sweeping immunity provisions of the City's port tariff valid and enforceable?

I.

Plaintiff, Societa per Azioni de Navigazione Italia (Shipowner), is the owner of the merchant vessel the M.V. *Da Verrazano.* Defendant City owns and operates the pilot station for Los Angeles Harbor.[1]

Shipowners customarily use a local pilot to guide ships through and within a harbor since these pilots are familiar with prevailing local conditions. The City maintains a staff of local pilots qualified to perform this service in the Port of Los Angeles. The City hires, fires, trains, supervises, and pays these pilots who are civil service employees. On request, the City will furnish one of its pilots to a ship. For this service, the City charges and collects a pilotage fee.

On July 30, 1974, the M.V. *Da Verrazano* arrived at the breakwater to Los Angeles Harbor. Through its local agent, the Shipowner ar-

---

[1]Pursuant to its charter, the City, through its board of harbor commissioners (Board), is responsible for the management, supervision and control of the Los Angeles Harbor. (Los Angeles City Charter (hereafter L.A.C.C.), art. XI, § 138.) The Board is specifically empowered to acquire and operate all facilities and services which it deems "necessary or convenient for the promotion or accommodation of commerce, navigation or fishery" within the harbor. (*Id.*, § 139, subd. (g).)

ranged for the Los Angeles pilot station to provide a local pilot to guide the ship to its berth within the harbor. The station assigned Harold Peterson. On boarding the *Da Verrazano*, Peterson went to the bridge and began to give orders regarding the ship's navigation. The master or commander of the ship stood beside Peterson and relayed his orders to appropriate crew members. Peterson gave orders directly to an assisting tug over a walkie-talkie. Apparently, the master of the *Da Verrazano* gave only Peterson's orders to the crew.[2]

Under Peterson's pilotage, the ship proceeded into the inner harbor. In order to reach its berth, the vessel was required to negotiate a 90-degree turn. Accordingly, Peterson gave orders intended to accomplish this maneuver. In the midst of the turn, however, the ship struck and damaged a wharf owned by the City and dock facilities owned by Union Oil Company.[3]

Following the collision, a dispute arose between the parties over who was to bear financial responsibility for the damages. The City disclaimed all responsibility, relying on the pilotage provisions of Los Angeles Port Tariff No. 3 which was adopted pursuant to City ordinance and in effect at the time of the collision. (See L.A. City Ord. No. 138,969; L.A.C.C., art. XI, § 139, subds. (b), (e), and (h).)[4]

The pertinent section of Tariff No. 3 reads as follows.[5] "It is understood and agreed, and is the essence of the contract under which pilotage services are proffered and rendered, and are requested and accepted by the vessel [or] her owners [] that the services of the pilot are re-

[2]Several pilots testified at the trial below that it is the custom and practice for a master to defer to the judgment of a pilot concerning navigation within a harbor. Indeed the pilots stated that the large majority of masters are not competent to navigate their vessels within the harbor. However, a master remains in overall command of the vessel and has some limited control over a pilot. A master may advise a pilot and retains the power to countermand a pilot's order.

[3]Although Union Oil Company participated in this action during its early stages, the company is not a party to this appeal.

[4]The city charter authorizes the Board to "fix, regulate, and collect rates, tolls and charges" for pilotage services (L.A.C.C., art. XI, § 139, subd. (e)) and to regulate the piloting of all vessels within the harbor (*id.*, § 139, subd. (b)). All such regulations must be approved by the Los Angeles City Council by ordinance. (*Id.*, § 139, subd. (h).)

[5]Brackets together, in this manner [], are used to indicate deletions from the ordinance. Brackets enclosing material are used to denote insertions or additions by this court. (See *Estate of McDill* (1975) 14 Cal.3d 831, 834 [122 Cal.Rptr. 754, 537 P.2d 874].)

quested and accepted on the express understanding that such pilotage services are given, done, or performed solely in the pilot's capacity as the servant of the vessel and of her owners . . . and the owners [] expressly covenant and agree [] not to assert any personal liability against the pilot or the City [] arising out of or connected with [] any damage, loss or expenses sustained by the vessel [or] her [] owners [] or by any third parties, even though resulting from [] negligence of the pilot . . . . [S]uch vessel and her owners [] further covenant and agree to indemnify and hold harmless the municipal pilot [and] the City [] in respect to any liability arising out of claims, suits or actions against the municipal pilot [or] the City [] by third parties, resulting from the [] negligence of the municipal pilot . . . . [¶] The vessel and her owners [] further covenant and agree that all damages to municipally owned [] facilities caused, directly or indirectly, by the vessel shall be paid promptly upon demand."

The parties were unable to resolve their dispute over who was to pay for the damages. As a result, in March 1975, the Shipowner filed an action for declaratory relief for the purpose of determining both the validity of the City's tariff and the extent of each party's liability for the damages arising out of the collision. The City answered and in October 1975 filed a cross-complaint which sought a declaration of its rights under the tariff and compensation for the damage to its dock. In its answer, the Shipowner denied liability for the City's damages. The Shipowner also filed a cross-complaint which sought indemnification from the City for any liability assessed against it.

The trial court, on motion for partial summary judgment, applied state law and held the City's tariff invalid under the Tort Claims Act. (See Gov. Code, § 810 et seq.) The case went to trial on the issue of who was liable since the parties had stipulated to the amount of damage done to the City's dock and to Union Oil's facilities.

In September 1979, the trial court found that both the pilot and the ship's crew had been negligent. Seventy-five percent of the responsibility for the collision was assigned to the pilot and twenty-five percent to the ship's crew. The court found that the City alone was liable for the negligence of its pilot-employee, and that the Shipowner alone was liable for the negligence of the crew. The court also denied the Shipowner's claim against the City for indemnification. Subsequently, the

Shipowner and the City together paid Union Oil the amount of its damages,[6] but reserved their rights against each other pending appeal.

Both parties appealed. The City contends that the Shipowner must bear financial responsibility for the negligence of the pilot because the tariff, or the common law "borrowed servant" doctrine so requires.[7] The Shipowner challenges only the denial of its indemnity claim against the City.[8]

II.

The primary issue presented by this case is who must bear the ultimate liability for that portion of the collision damages attributable to the negligence of the pilot furnished by the City to the Shipowner. After declaring the City's tariff void and unenforceable, the trial court held the City liable for all pilot-caused damages sustained by Union Oil on a respondeat superior theory. As a result of this ruling, the City must cover its own pilot-caused damages.[9]

The City contends that the trial court erred in finding it in any degree responsible for the negligence of its municipal pilot. According to the City, whether the question of liability is determined by reference

[6] The Shipowner paid Union Oil for that portion of its damages which were attributable to the negligence of the ship's crew. The City and the Shipowner each paid a 50 percent share of that portion of Union Oil's damages which were attributable to the negligence of the municipal pilot.

For ease of reference, the damages attributable to the negligence of the municipal pilot will be referred to hereafter as "pilot-caused damages."

[7] It is undisputed that the Shipowner is solely liable under the doctrine of respondeat superior for the negligence of the ship's crew and thus for 25 percent of the damages incurred by Union Oil and 25 percent of the damages incurred by the City.

[8] This court has jurisdiction over the subject matter of this maritime action (see 46 U.S.C. § 740) pursuant to the provisions of 28 United States Code section 1333. (See generally Gilmore & Black, The Law of Admirality (2d ed. 1975) §§ 1-13, pp. 37-40 [hereafter Gilmore & Black].)

[9] The vicarious liability of an employer for the torts of his employees "is designed for the protection of third persons against the risks of the enterprise . . . ." (Prosser, Torts (4th ed. 1971) § 72, p. 480.) It does not apply to any action between the employer and his employee. (Ibid.) Ordinarily, a pilot would be liable to his employer for his negligence. The California Tort Claims Act, however, severely restricts the ability of a municipality to recover against a negligent employee. (See Gov. Code, §§ 815.2, subd. (a), 825-825.6; Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) § 5.89, pp. 593-597.)

to the terms of its port tariff or by reference to otherwise applicable principles of law, it is the Shipowner alone who must pay for the damages caused by the pilot.

In essence, the City's position is that the challenged provisions of its tariff do not alter the liabilities of the parties. If this contention were correct, this court would not have to consider separately the question as to the validity and enforceability of the tariff. ██ ██ Therefore, the first issue to be decided is who is vicariously liable for the negligence of the municipal pilot: the City, the Shipowner, or both.[10]

██ There is a substantial body of federal maritime law concerning vicarious liability for pilot negligence. Its dominant theme is that in determining who is liable for the negligence of a pilot, courts are to apply the ordinary principles of the law of agency. Due regard is to be given to the peculiarities of maritime life. (See generally Gilmore & Black, *supra*, § 7-16, p. 520; *id.*, § 9-9, p. 598, fn. 24; Griffin on Collision (1949) §§ 187-193, pp. 435-444; cf. *United States* v. *Webb, Inc.* (1970) 397 U.S. 179 [25 L.Ed.2d 207, 90 S.Ct. 850].)

The federal courts have applied agency principles to determine whether a pilot's negligence can properly be imputed to shipowners (see, e.g., *Homer Ramsdell Co.* v. *Comp. Gen. Trans.* (1901) 182 U.S. 406 [45 L.Ed. 1155, 21 S.Ct. 831]); to pilots' associations (see, e.g., *Guy* v. *Donald* (1906) 203 U.S. 399 [51 L.Ed. 245, 27 S.Ct. 63]); and to municipalities or other governmental entities (see, e.g., *Port of Seattle* v. *M/V Maria Rubicon* (W.D. Wash. 1975) 404 F.Supp. 302).

██ The law of agency has long recognized that a person generally the servant of one master can become the borrowed servant of another.

---

[10]As a general rule, the substantive law to be applied in maritime actions is the general federal maritime law. (*Southern Pacific Co.* v. *Jensen* (1917) 244 U.S. 205, 215 [61 L.Ed. 1086, 1098, 37 S.Ct. 524]; *Intagliata* v. *Shipowners & Mer. etc. Co.* (1945) 26 Cal.2d 365, 369-370 [159 P.2d 1].) State law is to be applied only where it does not conflict with an established federal maritime rule or does not otherwise interfere with a needed uniformity in the characteristic features of the federal maritime law. (E.g., *Askew* v. *American Waterways Operators, Inc.* (1973) 411 U.S. 325, 338-340 [36 L.Ed.2d 280, 289-291, 93 S.Ct. 1590].)

The rule is no different where the action involves the legal consequences of negligent pilotage. While Congress has seen fit to delegate to the states the power to regulate pilotage (see 46 U.S.C. § 211), this regulatory authority has traditionally been viewed as encompassing only matters such as licensing, fees and the like. (See generally Annot., State Regulation of Maritime Pilots Under 46 USCS § 211 (1977) 35 A.L.R.Fed. 525.)

(E.g., *Denton* v. *Yazoo & M.V.R. Co.* (1932) 284 U.S. 305 [76 L.Ed. 310, 52 S.Ct. 141]; *Marsh* v. *Tilley Steel Co.* (1980) 26 Cal.3d 486, 492 [162 Cal.Rptr. 320, 606 P.2d 355]; Rest.2d Agency, § 227.) If the borrowed servant commits a tort while carrying out the bidding of the borrower, vicarious liability attaches to the borrower and not to the general master. (E.g., *Denton* v. *Yazoo & M.V.R. Co., supra,* 284 U.S. at p. 308 [76 L.Ed. at p. 311]; *Marsh* v. *Tilley Steel Co., supra,* 26 Cal.3d 486.)

■ Relying on these principles, the City contends that the sole master to whom liability can attach for the actions of its municipal pilot is the Shipowner, the borrowing master. This is an issue usually reserved for the trier of fact. (*Marsh* v. *Tilley Steel Co., supra,* 26 Cal.3d at p. 493; Rest.2d Agency, § 227, com. a.) Here, however, the City asserts that undisputed facts establish as a matter of maritime law that its pilotage system is voluntary, and that its pilots become the borrowed servants of shipowners who elect to use its pilotage service.

Whether the City's pilotage system is voluntary or compulsory is significant because if pilotage is compulsory, a shipowner has no in personam liability for the actions of a pilot. The relation of master and servant does not exist between the shipowner and the pilot, and the doctrine of respondeat superior is not applicable. (*Homer Ramsdell Co.* v. *Comp. Gen. Trans., supra,* 182 U.S. 406; *The Abangarez* (E.D.La. 1932) 60 F.2d 543, 544; see generally Rest.2d Agency, § 223, com. c; Gilmore & Black, *supra,* § 7-16, pp. 520-521, fn. 135.) The City, admittedly the pilot's general employer, would properly be held solely liable to third parties for his negligence if its pilotage system were compulsory. (E.g., *Paradise* v. *Shoemaker* (W.D.Wash. 1979) 470 F.Supp. 437, 439 [collecting cases].)

However, Los Angeles Port Tariff No. 3 provides for optional pilotage services to vessels entering, leaving or shifting within the port.[11] Although a vessel subject to the payment of pilotage fees must pay the City three-fourths of the applicable charge if it elects not to use a mu-

---

[11]Item 205, subdivision (a) of Port Tariff No. 3 provides: "The City of Los Angeles, acting by and through its Board of Harbor Commissioners, the governing body of the Port of Los Angeles, maintains a force of municipal pilots duly licensed to perform the service of piloting vessels in, into and out of the Port of Los Angeles. Any vessel entering, leaving, or shifting within the Port of Los Angeles, by her owners, master, operators, charterers or agents, may, but is not required to, request the services of and be piloted by a municipal pilot. Such pilotage services are understood to be voluntarily requested and voluntarily rendered."

nicipal pilot,[12] such a financial "inducement" has long been held not to render compulsory the use of a port's pilots. (E.g., *The Merrimac* (1871) 81 U.S. (14 Wall.) 199, 203 [20 L.Ed. 873, 874]; *United States v. SS President Van Buren* (*Van Buren II*) (9th Cir. 1973) 490 F.2d 504, 506-507.)

Controlling federal precedent thus renders the City's first premise beyond dispute. There is, however, a notable absence of authority for the second premise—that noncompulsory pilots in the general employ of a municipality become the borrowed servants of the shipowners who elect to use the municipality's pilotage service.

■ The law is well settled that where a shipowner voluntarily takes on a pilot not in the general employ of another, the shipowner is liable for that pilot's negligence. (E.g., *The China* (1869) 74 U.S. (7 Wall.) 53, 67-68 [19 L.Ed. 67, 72-73].) The federal courts have determined that in such circumstances the shipowner, through the master, has sufficient control or right of control over the pilot's conduct to render the pilot his servant. (*Ibid.*; see generally, Rest.2d Agency, § 220.)

In a land-based occupation, the question would be a close one, given the skill required of harbor pilots, the brief time a pilot is employed by a shipowner, and the comparatively broad authority a pilot has over the navigation of a ship while on board.[13] (See Rest.2d Agency, § 220, coms. e, h.) ■ In determining whether a person is an employee or an independent contractor, the most important factor is the right to control the manner and means by which the work is to be performed.

---

[12]Port Tariff No. 3, item 215, subdivision (a), exception 1 provides: "Three-fourths (3/4) the entering or leaving charge shall be assessed when [a] vessel subject to the payment of pilotage is not piloted by a municipal pilot."

[13]"As a profession, pilotage owes its existence to the infinite variety of navigation hazards—currents, tides, sand bars, submerged objects, weather conditions, and the like—that mark the harbors and rivers open to commercial vessels. No matter how competent the master of a ship is at open sea, he cannot be expected to be familiar with the local navigation hazards of each harbor and river that he encounters as he conducts his ship in the course of maritime trade. [Citation.] Accordingly, it has long been the practice of vessels to employ, for each port they enter and leave, a local pilot intimately familiar with the waters of that port to board and guide them through those waters in from or back to the open sea." (*Jackson v. Marine Exploration Co., Inc.* (5th Cir. 1978) 583 F.2d 1336, 1338-1339.)

Further, while on board a pilot is the "temporary master" of a vessel; "temporarily ... the whole conduct of the navigation of the ship ..." belongs to him. (*Cooley v. Board of Wardens of Port of Philadelphia et al.* (1851) 53 U.S. (12 How.) 298, 315 [13 L.Ed. 996, 1003]; *Ralli v. Troop* (1885) 157 U.S. 386, 402 [39 L.Ed. 742, 749, 15 S.Ct. 657]; see generally, Griffin on Collision, *supra*, § 190, pp. 439-440.)

"If control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent contractor relationship is established. [Citation.]" (*Tieberg* v. *Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 946-947 [88 Cal.Rptr. 175, 471 P.2d 975].) ▓ Thus, the broad authority over navigation which a pilot has would ordinarily weigh heavily against finding him an employee.[14]

Nevertheless, the federal courts have concluded that sufficient indicia of a master-servant relationship are present to hold the shipowner the pilot's employer.

First, the occupation is one which is ordinarily considered an incident of the shipowner's business. "The services of the pilot are as much for the benefit of the vessel and cargo as those of the captain and crew. . . ." (*The China, supra*, 74 U.S. (7 Wall.) at p. 67 [19 L.Ed. at p. 73]; see generally, Rest.2d Agency, § 220, com. i.) Second, the shipowner through the master has the capacity to exercise some limited control over the pilot.

The master controls the "premises" where the pilot's work is done. He remains in overall command of the vessel. (*The Oregon* (1895) 158 U.S. 186, 194 [39 L.Ed. 943, 948, 15 S.Ct. 804]; see generally, Rest.2d Agency, § 220, subd. (2)(a) & com. l.) Moreover, the master has some control over the pilot's actual performance of his task. He may advise the pilot. Further, "[i]t is his duty . . . to interfere . . . in cases of danger which [the pilot] does not foresee, and in all cases of great necessity." (*The China, supra*, 74 U.S. (7 Wall.) at p. 67 [19 L.Ed. at p. 73]; see generally, Rest.2d Agency, § 220, com. d.) The master has the same power to remove the pilot that he has to remove any regular member of the crew. (*The China, supra*, 74 U.S. (7 Wall.), at pp. 67-68 [19 L.Ed. at pp. 72-73].)

---

[14]"Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. [Citation.]" (*Tieberg* v. *Unemployment Ins. App. Bd., supra*, 2 Cal.3d at p. 949.)

Such a limited degree of control might not be sufficient to establish a master-servant relationship in a land-based occupation. However, that is not true under maritime law. "Control is probably the most important factor" in determining whether an employment relationship exists in maritime as well as in common law cases. (*United States* v. *Webb, Inc., supra*, 397 U.S. at p. 192 [25 L.Ed.2d at p. 215].) However, in the maritime context, any determination must be informed by "necessities of the sea." (*Id.*, at p. 191 [25 L.Ed.2d at p. 215].) One of these necessities is that seamen have greater discretion in the performance of their jobs than is usual in land-based occupations. (*Id.*, at p. 192.) As a result, unless "there is nearly total relinquishment of control through a bareboat, or demise, charter, the [ship]owner may ... be considered ... to have sufficient control to be charged ... an employer." (*Ibid.*)

The facts of this case establish that the Shipowner through the master had a comparable degree of control over the City's pilot. The testimony of both Petersen, the pilot whose negligence caused the collision, and Brady, a former pilot for the City, established the following facts regarding the relation between the City's pilots and shipowners who use their services. The master remains in overall command of the vessel. Although he will ordinarily defer to the expertise of the municipal pilot, the master can advise the pilot regarding the ship's navigation and has the power to countermand the pilot's orders.[15] Since the pilotage is voluntary, the master obviously has the power to terminate the pilot's service on the vessel at any time.

Given these circumstances, the trial court erred as a matter of law when it found the City to be Petersen's sole employer at the time of the collision for a master-servant relationship existed between the Shipowner and Petersen. (Accord Harb. & Nav. Code, § 820.) Perhaps foreseeing the inevitability of this conclusion, counsel for the Shipowner conceded this point by stipulating, at oral argument, that the Shipowner and the City are jointly and severally liable to Union Oil for the damages it sustained as a result of Petersen's negligence.

---

[15]It is generally accepted that the power to countermand should be used sparingly. "In light of the obvious confusion that would exist on a vessel if, on his slightest whim, the master would countermand the pilot's order, the master ... ought not to substitute his judgment for that of the pilot except in cases of obvious danger, or where danger is apparent and avoidable." (*Barbey Packing Corporation* v. *The S.S. Stavros* (D.Ore. 1959) 169 F.Supp. 897, 902 [a case involving voluntary pilotage]; see generally, Griffin on Collision, *supra*, § 190, p. 439-440.)

However, the conclusion that a master-servant relationship existed between the Shipowner and Petersen does not necessarily mean that the respondeat superior nexus between the City and Petersen had ceased to exist. The law of agency recognizes the possibility of dual employment. ■ "Where general and special employers share control of an employee's work, a 'dual employment' arises, and the general employer remains concurrently and simultaneously, jointly and severally liable [to third parties] for the employee's torts." (*Marsh* v. *Tilley Steel Co., supra*, 26 Cal.3d at pp. 494-495; see generally, Rest.2d Agency, § 220, subd. (1), § 226, com. a, § 243.) This is especially true where the loaned employee performs work of interest to both the general and special employers. (See Rest.2d Agency, §§ 226, 227, com. b.)

■ There is no question that Petersen was performing the business of the City when he undertook to conduct the *Da Verrazano* to its berth within Los Angeles Harbor. The City was engaged in the proprietary function of operating a pilotage service. (See *The Thielbek* (9th Cir. 1917) 241 F. 209; *United States* v. *Port of Portland* (D.Ore. 1906) 147 F. 865; *General Petroleum Corp.* v. *Los Angeles* (1937) 22 Cal.App.2d 332 [70 P.2d 998].)

Nor can there be any question that the City had a substantial interest in his work. As the United States Supreme Court has observed: "Pilots are ... indispensable cogs in the transportation system of every maritime economy. Their work prevents traffic congestion and accidents which would impair navigation in and to the ports. It affects ... in some measure, the competitive attractiveness of particular ports." (*Kotch* v. *Pilot Comm'rs* (1947) 330 U.S. 552, 558 [91 L.Ed. 1093, 1097-1098, 67 S.Ct. 910].)

Given these circumstances, there is a presumption that the pilot remained in his general employment. (See Rest.2d Agency, § 227, com. b; *Dellums* v. *Powell* (D.C. Cir. 1977) 566 F.2d 216, 221.) The City can avoid liability only if it can demonstrate that it gave up to the Shipowner "authoritative direction and control" over the pilot. (*The Standard Oil Co.* v. *Anderson* (1909) 212 U.S. 215, 222 [53 L.Ed. 480, 484, 29 S.Ct. 252].) "Authoritative direction and control" is more than the power to suggest details or the necessary cooperation. (*Ibid.*; accord *Kowalski* v. *Shell Oil Co.* (1978) 23 Cal.3d 171 [151 Cal.Rptr. 671, 588 P.2d 811].)

The record indicates, however, that the Shipowner did not have "authoritative direction and control" over Petersen. Petersen was under no obligation to obey an order given by the master. (Compare *Denton v. Yazoo & M.V.R. Co., supra,* 284 U.S. at p. 310 [76 L.Ed. at p. 312].) Both Petersen and Brady testified that they would entertain a master's "orders" but would not follow them if they thought the orders unwise. Instead, they would stop the vessel to discuss the matter. Moreover, the direction of assisting tugs was primarily, if not entirely, Petersen's province, and his judgment was always respected with regard to the number of tugs to be used.

The City, although not "present" at the scene, was not powerless to direct Petersen in the performance of his work. It was the City who trained him. It was the City who determined which jobs he would be assigned. Through its regulations such as the speed limits within the harbor, the City actually exercised control over the manner in which a given pilotage assignment was to be performed. There can be no question that Petersen was obligated to obey the City's directions. The City retained the power to suspend or terminate his employment. What the record shows, therefore, is that Petersen simultaneously served two employers—the City and the Shipowner.[16]

Since Petersen simultaneously served two employers—the City and the Shipowner—at the time of the collision, under the doctrine of respondeat superior both masters would be jointly and severally liable to third parties for his negligence. (E.g., *Marsh v. Tilley Steel Co., supra,* 26 Cal.3d at p. 495; cf. *Edmonds v. Compagnie Generale Transatl.* (1979) 443 U.S. 256, 260, fn. 7, 271-272, fn. 30 [61 L.Ed.2d 521, 527,

---

[16]The only maritime case involving similar circumstances to reach a contrary conclusion is *City of Los Angeles v. Standard Transp. Co.* (9th Cir. 1929) 32 F.2d 988. The case involved a collision between two ships, the *Lebec* and the *Seekonk,* in the inner Los Angeles Harbor. At the time of the collision, a noncompulsory municipal pilot was navigating the *Seekonk.*

The court found that the accident was proximately caused by the negligence of the master of the *Seekonk.* (*Id.,* at pp. 989-990.) It then went on to observe, *in dictum,* after a very cursory analysis, that the city could not have been held liable for the acts of the pilot in any event, since the pilot was the borrowed servant of the ship. (*Id.,* at p. 990.)

If this dictum ever had persuasive force, it certainly has none today. First, it should be noted that the court was apparently unaware that it had previously rejected this conclusion in another case also involving noncompulsory pilotage. (*The Thielbek, supra,* 241 F. 209, 214.) Moreover, in 1973, the Ninth Circuit tacitly recognized that under the ordinary rules of respondeat superior, a voluntary pilot, while engaged in the navigation of a ship, is the employee not only of the shipowner but also of his municipal employer. (*Van Buren II, supra,* 490 F.2d at p. 507.)

534-535, 99 S.Ct. 2753].)[17] As regards the City's pilot-caused damages, the pilot's status as the servant of both the City and the Shipowner previously would have barred the City from effectively asserting any liability for these damages against the Shipowner. Traditionally, the negligence of a common employee has been imputed against both his employers in any action between them, thereby effectively barring either employer from collecting damages from the other for any "personal" injury sustained as a result of a common employee's negligence. (See generally, Rest.2d Torts, § 491, com. k.; Rest.2d Agency, § 317; see also *United States* v. *Nielson* (1955) 349 U.S. 129, 131 [99 L.Ed. 939, 941, 75 S.Ct. 654].) Whether this should be the rule here is open to question in light of the development of comparative fault principles.[18]

## III.

 The next issue this court must decide is whether item 205(e) of Los Angeles Port Tariff No. 3 (hereafter, the tariff) is valid and enforceable as a municipal ordinance or regulation. Pursuant to the provisions of the tariff (see *ante*, at pp. 452-453), the City seeks to escape all respondeat superior liability for the negligence of its municipal pilots. Failing that, it wishes to secure full indemnification from the shipowners and impose upon them liability for the damages proximately caused by pilot negligence to the City's own facilities.

The Shipowner contends that the tariff/ordinance is void since it purports to regulate the tort liability of the City with regard to its negligent employees. According to the Shipowner, such regulation invades a field preempted by the Legislature through the Tort Claims Act (Gov. Code, § 810 et seq.)[19] and, therefore, is precluded.

Los Angeles is a chartered city with the power to "make and enforce all ordinances and regulations in respect to municipal affairs, subject

---

[17]Appellants have not addressed the question of how this liability should be apportioned between themselves. More specifically, neither has discussed whether comparative indemnity principles should be applied to apportion this liability. (See generally, *United States* v. *Reliable Transfer Co.* (1975) 421 U.S. 397 [44 L.Ed.2d 251, 95 S.Ct. 1708]; *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899].)

[18]Neither party to this appeal has addressed whether, under comparative fault principles, the Shipowner should bear some liability for the City's pilot-caused damages.

[19]Unless otherwise indicated, all statutory references hereafter are to the Government Code.

only to [the] restrictions and limitations provided in [its] charter[ ]." (Cal. Const., art. XI, § 5, subd. (a).) As a result, "ordinances relating to matters which are purely 'municipal affairs' are not invalid because they are in conflict with general state laws or because state laws have been enacted to cover the same subject. [Citation.]" (*Baron* v. *City of Los Angeles* (1970) 2 Cal.3d 535, 539 [86 Cal.Rptr. 673, 469 P.2d 353, 42 A.L.R.2d 1036].)

Quite understandably, the City does not contend that the existence and extent of its liability for the torts of its employees is purely a "municipal affair." It has long been settled that "'the liability of municipalities . . . for the tortious acts or omissions of their servants is a matter of general state concern.'" (*Helbach* v. *City of Long Beach* (1942) 50 Cal.App.2d 242, 246 [123 P.2d 62]; accord *Eastlick* v. *City of Los Angeles* (1947) 29 Cal.2d 661, 665 [177 P.2d 558, 170 A.L.R. 225]; *Dept. of Water & Power* v. *Inyo Chem. Co.* (1940) 16 Cal.2d 744 [108 P.2d 410]; *Douglass* v. *City of Los Angeles* (1935) 5 Cal.2d 123, 128 [53 P.2d 353]; see generally Sato, *"Municipal Affairs" in California* (1972) 60 Cal.L.Rev. 1055, 1092-1093.) Therefore, the City's tariff/ordinance "cannot be given effect to the extent that it conflicts with general laws either directly or by entering a field which general laws are intended to occupy to the exclusion of municipal regulation. [Citations.]" (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 141 [130 Cal.Rptr. 465, 550 P.2d 1001].)

To the extent that the tariff/ordinance purports to exculpate the City from respondeat superior liability for the torts of its pilot-employees, it is in direct conflict with general state law. The Tort Claims Act provides that the substantive liabilities and immunities of all independent public entities, including cities (§ 811.2), shall be as provided by *statute*. (§ 815.) As defined by the act, the term "statute" does not include local ordinances or regulations. (§ 811.8.) Thus, the act expressly denies the public entity the power to enact an ordinance abridging its statutory liabilities or expanding its statutory immunities.

Further, the general rule is that an employee of a public entity is liable for his torts to the same extent as a private person (§ 820, subd. (a)) and the public entity is vicariously liable for any injury which its employee causes (§ 815.2, subd. (a)) to the same extent as a private employer (§ 815, subd. (b)).[20]

---

[20]There are statutory exceptions but none are relevant here. (See generally, Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980).)

These principles and the rule that a "private" pilot is liable for his own negligence (Griffin On Collision, *supra*, § 188, p. 437), make the City vicariously liable to third parties for injuries proximately caused by the negligence of its pilot-employees to the same extent as a private employer. (See *ante*, at pp. 461-462.) Further, a city may not abridge, much less abolish, this liability *by ordinance*. To the extent that the tariff-as-ordinance purports to exculpate the City from its respondeat superior liability for pilot negligence, it is void.

Similarly, to the extent that the tariff/ordinance purports to preclude shipowners from asserting a cause of action for implied comparative indemnification against the City, it is also void because it is in direct conflict with the general law. (See *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899]; *United States* v. *Reliable Transfer Co.* (1975) 421 U.S. 397 [44 L.Ed. 2d 251, 95 S.Ct. 1708].) This court has previously recognized that public entities are liable for implied comparative indemnification at least where, as here, a basis for liability is provided in the Tort Claims Act. (See *E.L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 511 [146 Cal.Rptr. 614, 579 P.2d 505] [City held liable for implied comparative indemnity arising out of the dangerous condition of public property].)

It is equally clear that the City may not assert its declared right to full indemnification under the tariff/ordinance as a defense to its liabilities to the Shipowner. Under the Tort Claims Act, "a defense not available to a private defendant is likewise not available to a public entity defendant absent statutory authority." (Van Alstyne, *supra*, § 2.30, p. 73; see § 815, subd. (b).) Moreover, what the City may not assert defensively, it may not assert affirmatively. That is, the City by ordinance may not enlarge its own right to implied comparative indemnification. To hold otherwise would be to allow the City to nullify to a greater or lesser extent its own liability for implied comparative indemnification. The City may not nullify the statutory right of a shipowner to shift a tort-related loss to the City. (See *Levine* v. *City of Los Angeles* (1977) 68 Cal.App.3d 481, 487 [137 Cal.Rptr. 512].)

With this review, it becomes apparent that each and every clause of the City's tariff/ordinance is in direct conflict with the general law. Therefore, the tariff is not valid and enforceable as a municipal ordinance or regulation and the Shipowner is not bound by its terms as a matter of law. This result is not surprising. It merely demonstrates the

comprehensive nature of the Tort Claims Act. (See *County of Los Angeles v. Superior Court* (1965) 62 Cal.2d 839, 844-845 [44 Cal.Rptr. 796, 402 P.2d 868].)

## IV.

■ In a final effort to garner for itself the protections of its tariff, the City next contends that the tariff provisions were incorporated in its oral contract with the Shipowner for pilotage services. The City quite correctly notes that the Tort Claims Act in no way restricts its authority to alter its liabilities by contract. (§ 814; see *County of San Joaquin v. Stockton Swim Club* (1974) 42 Cal.App.3d 968 [117 Cal.Rptr. 300].) Moreover, under maritime law, federal courts have enforced exculpatory and indemnification clauses in pilotage contracts in some situations. (E.g. *Sun Oil Co. v. Dalzell Towing Co.* (1932) 287 U.S. 291 [77 L.Ed. 311, 53 S.Ct. 135]; *United States v. S.S. President Van Buren, supra,* 490 F.2d 504.)

That an implied contract arose from the Shipowner's request for pilotage services cannot be disputed. (See *People v. Randono* (1973) 32 Cal.App.3d 164, 174 [108 Cal.Rptr. 326]; *Tankers and Tramps Corp. v. Tugs Jane McAllister, etc.* (2d Cir. 1966) 358 F.2d 896.) Having failed to introduce any evidence that the Shipowner had actual notice of the tariff provisions, the City relies primarily on constructive notice theories to establish that the terms of the tariff were intended to be incorporated in this contract.

The City initially contended that the Shipowner was bound by the tariff because it was filed with the Federal Maritime Commission (FMC). Those who use services covered by a tariff are deemed to have constructive knowledge of tariff provisions that are required by law to be, and are in fact, filed with the FMC. (*Port of Tacoma v. S.S. Duval* (9th Cir. 1966) 364 F.2d 615, 617; *Pacific S.S. Co. v. Cackette* (9th Cir. 1925) 8 F.2d 259, 261; cf. *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 6-7 [114 Cal.Rptr. 753, 523 P.2d 1161]; *id.,* at p. 14 [dis. opn.. of Mosk, J.].) Such provisions are binding even if the user of the services lacks actual knowledge of the provisions. (See *Chadbourn-Caribbean Ind. v. Autoridad, etc.* (D. Puerto Rico 1977) 428 F.Supp. 493, 495.)

However, the City failed to introduce any evidence that its tariff was filed with FMC. Moreover, the City has now conceded that "[n]othing

in the Shipping Act of 1916, 46 U.S.C. § 801 *et seq.*, or in the applicable regulations, 46 C.F.R. § 533.3, requires ... provisions limiting ... liability ..." to be filed with the FMC. (*La Salle Mach. Tool, Inc.* v. *Maher Terminals, Inc.* (4th Cir. 1979) 611 F.2d 56, 60; see also *Port of Tacoma* v. *S.S. Duval, supra*, 364 F.2d at p. 617.) Accordingly, this doctrine provides no basis whatsoever for imputing knowledge of the exculpatory and indemnity provisions of the City's tariff to the Shipowner at the time their contract was formed.

The City's reliance on the doctrine that "All applicable laws and ordinances in existence when [an] agreement is made become a part thereof as fully as if incorporated by reference" (1 Witkin, Summary of Cal. Law (8th ed. 1973) § 530, p. 452) is equally unavailing. Its force and effect is wholly vitiated by the invalidity of the tariff-as-ordinance. It would be anomalous indeed for this court to hold the Shipowner bound, under a constructive notice theory, by the terms of a void ordinance.

Finally, the City made a half-hearted attempt to argue that earlier transactions with the Shipowner demonstrated that the contract here impliedly included the tariff's terms. If prior dealings between the City and the Shipowner involving the tariff had been proven, an inference that its terms were incorporated in the contract might well be justified. (See e.g., *Sun Oil Co.* v. *Dalzell Towing Co.* (2d Cir. 1932) 55 F.2d 63, 64-65, affd. (1932) 287 U.S. 291 [77 L.Ed. 311, 53 S.Ct. 135]; *Tankers and Tramps Corp.* v. *Tugs Jane McAllister, etc., supra*, 358 F.2d at p. 899.)

The proof of such prior dealings is lacking here. The City established that the Shipowner had a local agent through whom it had previously arranged to use the City's pilotage services on a number of occasions. However, no evidence at all was introduced to establish that the provisions of the tariff were ever brought to the attention of the local agent or any other responsible agent of the Shipowner. (See *Tankers and Tramps Corp., supra*, 358 F.2d at p. 899.) In the absence of any evidence from which it reasonably could be inferred that both the City and Shipowner intended that the terms of the tariff be incorporated in their contract, this court cannot say that the trial court erred in finding that the terms were not incorporated therein.

## V.

Turning to the Shipowner's appeal, the question is presented as to whether the Shipowner is entitled to recover from the City full indemnity against the liability assessed against it for the negligence of the ship's crew. Purportedly relying on *Ryan Co. v. Pan-Atlantic Corp.* (1956) 350 U.S. 124 [100 L.Ed. 133, 76 S.Ct. 232] and its progeny, the Shipowner argues that it is entitled to indemnity because the City breached an implied warranty that the pilotage service would be performed in a workmanlike fashion.

If this court were to assume for purposes of argument that the contract between the City and the Shipowner included an implied warranty of workmanlike performance, the Shipowner could prevail only if it established that the warranty encompassed an obligation to indemnify. (See *City of Long Beach* v. *American President Lines* (9th Cir. 1955) 223 F.2d 853, 857; *Barbey Packing Corporation* v. *The S.S. Stavros, supra*, 169 F.Supp. at p. 903.) "[T]he factors to be considered in determining whether a contract includes a warranty of workmanlike performance are entirely separate from the factors that go into the determination of whether that warranty encompasses an obligation to indemnify." (*Fairmont Ship. Corp.* v. *Chevron Internat'l Oil Co., Inc.* (2d Cir. 1975) 511 F.2d 1252, 1259, cert. den., 423 U.S. 838 [46 L.Ed.2d 57, 96 S.Ct. 66].) The factors necessary to find an obligation to indemnify is the question addressed by *Ryan* and its progeny.

After a thorough review of the *Ryan* cases, the Second Circuit Court of Appeals found one of the "crucial" factors to be "a contract whereby the contractor agrees to perform services without supervision or control by the shipowner . . . ." (*Fairmont Ship. Corp., supra*, 511 F.2d at p. 1258; accord *Italia Societa per Azioni di Navigazione* v. *Oregon Stevedoring Co. Inc.* (1964) 376 U.S. 315 [11 L.Ed.2d 732, 84 S.Ct. 748]; *Stevens* v. *East-West Towing Co., Inc.* (5th Cir. 1981) 649 F.2d 1104, 1108-1109.) Absent such agreement, no obligation to indemnify may be implied. (*Fairmont Ship. Corp., supra*, 511 F.2d at p. 1258.)

Here, the City did not undertake to perform pilotage services "without supervision or control" by the Shipowner. Therefore, its asserted warranty of workmanlike performance may not be construed to encompass an obligation to indemnify.

## VI.

In conclusion, the City's tariff-ordinance cannot be enforced against the Shipowner. As an ordinance, it is void and unenforceable under the Tort Claims Act. Further, the City failed to establish that the terms of the tariff were incorporated in its oral contract with the Shipowner. The trial court was correct in finding that the Shipowner was not bound by the tariff. The trial court was also correct in rejecting the Shipowner's claim for indemnity.

The trial court erred, however, in finding the City solely liable for the pilot-caused damages sustained by Union Oil Company. Under the general principles of the doctrine of respondeat superior the Shipowner and the City are jointly and severally liable for these damages. The judgment of the trial court is, therefore, reversed to this extent.

Since neither party to this appeal has had the opportunity to address whether or how the pilot-caused damages sustained by the City and by Union Oil should be apportioned as between the City and the Shipowner, this issue should be resolved by the trial court. Consequently, this case is remanded to the trial court for further proceedings consistent with the views expressed in this opinion. Each party shall bear its own costs on appeal.

Mosk, J., Newman, J., Kaus, J., and Broussard, J., concurred.

Richardson, J., concurred in the judgment.

The petition of appellant City of Los Angeles for a rehearing was denied June 23, 1982.